**LISBON CONTRACTORS,
INC., Appellee,**

v.

**The UNITED STATES, Appellant.**

**Appeal No. 86–1461.**

United States Court of Appeals,
Federal Circuit.

Sept. 9, 1987.

Michael T. Paul, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellant. With him on brief, were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director.

George E. Rahn, Jr., Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., argued for appellee.

Before NIES, BISSELL, and ARCHER, Circuit Judges.

NIES, Circuit Judge.

The United States appeals from the judgment of the United States Claims Court, No. 288–81C, awarding $95,748.15 to Lisbon Contractors, Inc. as termination for convenience costs under a construction contract. The Claims Court held that the United States wrongfully terminated Lisbon for default thereby converting the termination to one for convenience of the government. We affirm-in-part, reverse-in-part, vacate-in-part, and remand for entry of a reduced damage award.

I

On August 8, 1979, Lisbon and the United States Soil Conservation Service (SCS) entered into Contract No. 50–3A75–9–35 for construction of a reinforced concrete flood control channel and a bridge. With extensions of time, the completion date was December 20, 1980. Work began in the fall of 1979 on the bridge portion of the contract. As is frequent in construction projects, Lisbon encountered difficulties. Lisbon's concrete subcontractor, Versatile Constructors, was a major source of Lisbon's problems. The government attributed that difficulty to poor supervision by Lisbon.

In the succeeding months the parties exchanged numerous letters discussing Lisbon's progress on the project. On several occasions the contracting officer's representative threatened to terminate Lisbon's right to proceed unless Lisbon took immediate action to correct specific problems. SCS was concerned about the following items: (1) Versatile Constructors' performance as the concrete subcontractor, (2) Anthony Rebimbas' performance as Lisbon's construction superintendent, (3) the quality of the concrete work, and (4) Lisbon's progress on the work. Typically Lisbon responded by taking some action to correct the problems, which did not fully satisfy

SCS, whereupon negotiations would continue. In January, 1980, for example, the contracting officer required Lisbon to submit a revised construction schedule with information on additional work forces and equipment. Lisbon submitted a revised schedule with some details, but the contracting officer requested more.

To meet SCS's objections, Lisbon designated its vice president, Peter Campellone, as acting superintendent (with the government's approval) until it could find a replacement, and it terminated Versatile as the concrete subcontractor once the bridge was completed.[1] It remedied specific complaints on work item deficiencies identified by SCS. SCS inspected and paid for the work. On April 7, 1980, Lisbon requested a meeting between the contracting officer and Lisbon's president, Anthony Marques, to resolve the items still at issue, namely, the construction schedule and the superintendent issues. Also Lisbon had requested a change in the specifications to allow it to remove concrete forms more quickly (the "sleeper joint" issue).

The parties met on April 30, 1980. Lisbon renewed its request for a modification of the contracting officer's interpretation of the sleeper joint issue which would enable Lisbon to perform the work more efficiently and expeditiously. Mr. Marques became incensed because SCS never made the analysis it had promised with respect to the requested change. At the meeting, SCS adamantly refused to approve the change, and tempers flared. Following the heated altercation on this issue, during which Mr. Marques had indicated he needed the change to complete the work on time, the SCS representatives reiterated their displeasure with various aspects of Lisbon's performance. The SCS representatives then left the meeting to caucus because, per the contracting officer, everybody was going in different directions. After discussing the matter among themselves for approximately twenty minutes, they returned and the contracting officer an-

---

1. The bridge portion of the work was not completed until February, 1980, behind schedule, but that was not the basis for termination.

nounced that, in his opinion, Lisbon could not complete the job satisfactorily within the time limitations set in the contract, and he was terminating the contract for default. Mr. Marques promptly withdrew his "demand" for a change and offered to do everything necessary to complete the work on time, even at a loss, in accordance with the contract. The contracting officer refused to discuss Lisbon's further performance under the contract. Thus, the matter of the superintendent and the details of the revised schedule Lisbon had submitted, which did not depend on the proposed change, were never taken up. A telegram subsequently confirmed the termination. SCS rebid the contract and engaged a follow-on contractor to complete the project. The project was eventually completed on December 10, 1981.[2]

The action of the contracting officer in terminating Lisbon for default was taken pursuant to General Provision 5 of the contract at issue here, which contains the following standard language:

> If the Contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in this contract, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the Contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay.
>
> . . . .

If, after notice of termination of the Contractor's right to proceed under the provisions of this clause, it is determined for any reason that the Contractor was not in default under the provisions of this clause, or that the delay was excusable under the provisions of this clause, the rights and obligations of the parties shall, if the contract contains a clause providing for termination for convenience of the Government, be the same as if the notice of termination had been issued pursuant to such clause.

The contract contains a standard termination for convenience clause.

On December 19, 1980, Lisbon submitted a certified claim to the contracting officer, asserting that the government's termination for default was not justified and claiming a right to certain costs under the termination for convenience clause of the contract. The contracting officer responded by referring to the default termination decision, thereby rejecting the claim, and Lisbon timely filed a direct access action in the Court of Claims[3] pursuant to the Contract Disputes Act (CDA), 41 U.S.C. § 609(a) (1982).[4]

Before the Claims Court, Lisbon reiterated its assertions that it was not in default, that the termination should be converted to a termination for convenience, and that, under the contract and applicable regulations, it was entitled to recover certain costs incidental to termination for convenience.[5] The government filed a counterclaim to collect its reprocurement costs

2. It appears that, after termination, Lisbon's revised completion date was fixed as July 1, 1981, from which date the government calculated liquidated damages for 162 days' delay.

3. Cases pending in the Court of Claims, Trial Division, were transferred to the newly-formed Claims Court pursuant to the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, § 403(d), 96 Stat. 25, 58 (1982) (28 U.S.C. § 171 note on Transition Provisions: Transfer of Pending Cases).

4. Section 609(a) provides in pertinent part:
   (1) Except as provided in paragraph (2), and in lieu of appealing the decision of the contracting officer under section 605 of this title to an agency board, a contractor may bring an action directly on the claim in the

United States Claims Court, notwithstanding any contract provision, regulation, or rule of law to the contrary.
   . . . .
   (3) Any action under paragraph (1) or (2) shall be filed within twelve months from the date of the receipt by the contractor of the decision of the contracting officer concerning the claim, and shall proceed de novo in accordance with the rules of the appropriate court.

5. No other measure of damages for wrongful termination by the government was available to Lisbon, its damage claim being limited by the regulations governing termination for convenience.

of approximately $477,000, awarded by a subsequent contracting officer's decision. The Claims Court dismissed the government's claim and entered judgment in favor of Lisbon, but for a lesser amount than it had sought. Both parties appealed the Claims Court's judgment to this court. In the initial appeal, we vacated the judgment and remanded the case for restatement of the court's findings and legal conclusions. *Lisbon Contractors, Inc. v. United States*, 785 F.2d 323 (1985). On reviewing the initial order, we could not determine whether the court had invalidated the default termination because of a substantive or a procedural defect, and we requested additional findings with respect to the proof of Lisbon's losses.

In response to our remand, the Claims Court issued a new order explaining that its decision on default did not rest on procedural but on substantive grounds. The evidence did not establish to the court's satisfaction that Lisbon could not have completed the remaining work on time. It noted that none of the government's witnesses even addressed the issue of whether Lisbon would have completed the work on time. No formal study was made on the matter. There was no evidence that the contracting officer made an "informed decision," leading the Claims Court to conclude that the contract had not been terminated because of Lisbon's default. The court also explained its decision on the amount of the award in somewhat greater detail.

The United States has again appealed arguing that the Claims Court erred by: (1) placing a burden on the government, in establishing default, to prove more than that Lisbon was behind schedule at the time of termination, (2) finding that, when defaulted, Lisbon had a full-time superintendent and an acceptable revised construction schedule, (3) placing a burden on the government to disprove the items Lisbon claimed as termination for convenience costs, and (4) denying the government's reprocurement damage claim.

Our scope of review of Claims Court decisions is limited to the correction of errors of law and clearly erroneous findings

of fact. *Milmark Servs., Inc. v. United States*, 731 F.2d 855, 857 (Fed.Cir.1984).

## II

### Issues

1. Did the trial court place too great a burden on the government in connection with proof of default?

2. Did the trial court erroneously find that, at the time the government terminated the contract, Lisbon had a full-time superintendent and an acceptable revised construction schedule?

3. Was the trial court clearly erroneous in finding Lisbon proved each of the items allowed as a termination cost?

## III

### The Default Termination Issue

#### A. *Burden of Proof*

This case raises for the first time before this court issues with respect to the burden of proof of default in a direct access action under the CDA, 41 U.S.C. § 609(a) (1982). The Claims Court stated that throughout the proceeding there has been a question of who has the burden of proof. It continues into the appeal. We conclude that the government bears the burden of proof on the *issue* of default by the contractor in this type of proceeding.

The Claims Court states that the parties agreed at trial that the government bears the burden of proof that the default termination was proper. On appeal, the government does not directly challenge that the government had to prove it was justified in terminating the contractor for default. It speaks instead of having been required to satisfy an impossibly high *standard* for what amounts to a default and, further, seeks to set up sub-issues under the default issue on which it urges that the contractor should be made to bear the burden of proof. In particular, the government asserts that it should have had to prove only that there was a delay in performance, and the contractor should then have had to establish that the delay was justified. The government sometimes couches the latter

theory in terms of shifting burdens of production, but, in effect, it argues that the *contractor* should bear the ultimate burden of proof on the default issue.[6] This would mean that a contractor would have to show that the contract was wrongfully terminated rather than the government having to prove that the contract was rightfully terminated. Because review under the CDA in the Claims Court is *de novo*, 41 U.S.C. § 609(a)(3) (1982), the allocation of the burden of proof must be determined as it can be critical to the result.

We note that it is long-established government contract law in cases brought to the boards of contract appeals (BCA's) that the government bears the burden of proof on the issue of the correctness of its actions in terminating a contractor for default. *See, e.g., Air-O-Plastik Corp.*, GSBCA Nos. 4802, 4870, 4925, 4965, 81-2 BCA (CCH) ¶ 15,338, 75,965-68 (Sept. 18, 1981); *G.A. Karnavas Painting Co.*, ASBCA No. 19569, 76-1 BCA (CCH) ¶ 11,-837, 56,604-05 (Mar. 16, 1976); *see generally*, Speck, *Government Claims Against Contractors*, 13 Pub.Cont.L.J., 137, 139-44 (1982). It is also the practice of BCA's to accept an appeal by the contractor from the contracting officer's decision ordering termination for default, that is, prior to the submission of any monetary claim by either the government or the contractor. The default termination order is deemed by the BCA's to be a decision by the contracting officer on a government "claim" against the contractor[7] which, being adverse, the contractor may appeal to the board under the CDA.[8] In view of this background and procedure, the imposition of the burden of proof of default in BCA appeals falls natu-

rally on the government inasmuch as the government is only being made to bear the burden of proof on its own "claim" of default. Only after the default issue is resolved, does the board turn to any "claim" by the government or the contractor for monetary compensation. *See Almeda Indus., Inc.*, ENG BCA No. 5148, 87-1 BCA (CCH) ¶ 19,401, 98106 (Oct. 23, 1986).

Lisbon did not seek review before a BCA, pursuing instead the alternative of a direct appeal in the Claims Court from a contracting officer's decision. Differing with the BCA's, the Claims Court, in several decisions, has stated that the contracting officer's termination for default order is not deemed a "decision" on a government "claim" and, therefore, is not independently appealable. *See Industrial Coatings, Inc. v. United States*, 11 Cl.Ct. 161, 163-64 (1986); *Gunn-Williams v. United States*, 8 Cl.Ct. 531, 534-35 (1985); *cf. Z.A.N. Co. v. United States*, 6 Cl.Ct. 298, 305-06 (1984). Here, the contractor effectively obtained a ruling from the contracting officer denying the contractor's own "claim" for termination for convenience costs, and, thus, was able to get into the Claims Court. Because the contractor is asserting its own "claim," it might, at first blush, seem appropriate to place the burden of proof on all elements of its claim on the contractor. An element of the contractor's claim is, of course, the propriety of the default termination by the government. Were we to place the burden of proof of default on the contractor in direct access appeals to the Claims Court under the CDA, the government would receive an advantage simply by reason of the choice of forum, a result which finds no support in the statute or

---

**6.** In its brief it states, e.g., "Lisbon also failed to meet its burden of proving that it would have completed the job in a timely fashion within contract specifications."

**7.** If the government also demands a particular amount of damages from the contractor at some later time, that is treated as a separate government "claim."

**8.** 41 U.S.C. § 605(a) (1982) provides in pertinent part:

All claims by a contractor against the government relating to a contract shall be in

writing and shall be submitted to the contracting officer for a decision. All claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer....

41 U.S.C. § 606 (1982) provides:

Within ninety days from the date of receipt of a contracting officer's decision under section 605 of this title, the contractor may appeal such decision to an agency board of contract appeals, as provided in section 607 of this title.

Court of Claims precedent. As was stated in *J.D. Hedin Constr. Co. v. United States*, 408 F.2d 424, 431, 187 Ct.Cl. 45 (1969), "a default-termination is a drastic sanction (*see Schlesinger v. United States*, 390 F.2d 702, 709, 182 Ct.Cl. 571, 584 (1968)) which should be imposed (or sustained) only for good grounds and on solid evidence."

■ In view of those considerations, we conclude that the government should bear the burden of proof with respect to the issue of whether termination for default was justified, regardless of the forum and regardless of whose "claim" is being asserted. Thus, the burden of proof here was on the government on the default issue.

■ The order of presentation of evidence by the parties is a matter of trial management. Contrary to the government's view, the procedural requirements of the court for one party and then the other to come forward with evidence does not shift the ultimate burden of proof or persuasion on an issue back and forth. In other words, the government did not, as it urges, satisfy its burden by merely showing that the contractor was behind schedule. Rather, on the entirety of the record, the trial court must determine if the party bearing the burden of proof has proved its side of the issue by at least the weight of the evidence.[9] If the evidence on the issue is evenly balanced, the party with the burden loses. In this case, the government bore the burden on the issue of default raised by the contractor's complaint.

B. *Standard for Default for Failure to Prosecute with Diligence*

With respect to the government's challenge to the standard imposed by the Claims Court to establish the contractor's default here, we do not agree that the Claims Court ultimately required the government to prove that the contractor could not possibly complete the work before the date fixed in the contract. To make this argument, the government relies on isolated statements of the court read out of context. On this issue, the court unequivocally held:

> The standard default clause does not require a finding that completion within the contract time is impossible. Termination for default is appropriate if a demonstrated lack of diligence indicates that [the government] could not be assured of timely completion. Case law that involves abandoned or repudiated contracts, and terminations that involve a failure to make progress, applies. *Discount Co. v. United States*, 554 F.2d 435, 441 [213 Ct.Cl. 567] (1977); *Universal Fiberglass Corp. v. United States*, 537 F.2d at 398.

Slip op. at 14.

■ We agree that the contractual language found in General Provision 5 does not require absolute impossibility of performance by the contractor before the government may declare the contract in default. *See Discount Co. v. United States*, 554 F.2d 435, 441, 213 Ct.Cl. 567, *cert. denied*, 434 U.S. 938, 98 S.Ct. 428, 54 L.Ed.2d 298 (1977). Nor does it permit default termination merely on the ground that performance is less than absolutely certain. Rather, we construe the contract, as did the Claims Court, to require a reasonable belief on the part of the contracting officer that there was "no reasonable likelihood that the [contractor] could perform the entire contract effort within the time remaining for contract performance." *RFI Shield-Rooms*, ASBCA Nos. 17374, 17991, 77-2 BCA (CCH) ¶ 12,714, 61,735 (Aug. 11, 1977); *see also Discount*, 554 F.2d at 441 (justifiable insecurity about the contract's timely completion required). Although the government argues strenuously to the contrary, the Claims Court placed upon the government no greater burden of proving default than that described in *Discount*.

C. *The Evidence of Default*

The sole basis here for termination for default was Lisbon's failure, under General

9. It must be noted that the contractor here asserted no affirmative defense, such as excusable delay. Our opinion does not encompass such matters.

Provision 5 of the contract, "to prosecute the work ... with such diligence as will insure its completion within the time specified in th[e] contract." At trial, the government did not offer *direct* testimony or any other *direct* evidence on the time which it estimated it would take Lisbon to complete the contract. Indeed, the contracting officer acknowledged that the government did not undertake a study to determine whether Lisbon could complete the work within the required time, or determine how long it would take a follow-on contractor to do the work. Such a comparison is mandated by the relevant procurement regulations. 41 C.F.R. § 1–18.803–5(a)(3).

■ The government argues that it was, nevertheless, justified in terminating for failure to make progress because Lisbon (1) did not sufficiently support its revised construction schedule to show the manner in which it would regain time to achieve the due date and (2) failed to designate an acceptable, full-time superintendent. Thus, per the government, the contracting officer had reasonable doubts concerning Lisbon's ability to complete the job in a timely fashion. Under the *Discount* decision, the government argues, the default for untimely progress was justified, the contractor being required in *Discount* to reasonably assure the contracting officer that he could complete the job on time.

The Claims Court made the following findings:

26. At the start of the April 30, 1980, meeting, the matters [the government] had complained about were in the following status:

(1) Versatile's subcontract had been terminated.

(2) [Lisbon] had a full-time superintendent.

(3) All previous complaints on various work item deficiencies had been remedied; the work had been inspected; and [Lisbon] had been paid for the work.

(4) Lisbon had submitted a revised schedule which showed the work could be completed timely, using procedures that accorded with [the government's] interpretation of the specifications on the sleeper joint issue.

Slip op. at 39.

To give any viability to the government's justification argument, the government must persuade us that findings (2) and (4) above are clearly erroneous. A finding of fact is clearly erroneous when " 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Milmark Servs., Inc. v. United States,* 731 F.2d 855, 857 (Fed.Cir.1984) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

The record before us indicates that the parties arranged the April 30, 1980 meeting between Lisbon's president and the contracting officer to resolve their differences so they could pursue completion of the project. The superintendent and revised construction schedule problems were matters the parties sought to resolve at the meeting.

Whether Mr. Campellone, Lisbon's vice president, was a full-time superintendent on April 30, 1980, was disputed. The government maintains his health was too poor to permit him to work full time. He had been accepted by the government in January when there was minimal construction activity and it was intended he would serve only temporarily until the superintendent dispute was resolved. There is no dispute that Lisbon was prepared to discuss superintendence at the meeting, and that the meeting broke up before that issue was reached. On the record before us, we are not persuaded that the Claims Court's finding of fact (2) above is clearly erroneous.

The government maintains that the Claims Court erred in finding that Lisbon had submitted a revised schedule of work at the time of termination. Per the government, the schedule was not acceptable because Lisbon did not supply the details of the additional work forces and equipment necessary to complete the job under the

contract. The government asked, for example, for the names of specific laborers Lisbon would commit to the job and for copies of sub-contracts. Per the government, these deficiencies, viewed in the context of past poor performance, were a sufficient basis for concluding that the contractor could not finish on time. The government also urges that Lisbon's president admitted at the meeting that Lisbon could not complete the work without a change in the contract specifications.

One purpose of the meeting was to work out problems of the work schedule. There was conflicting evidence concerning what occurred at the meeting, and the trial court found the testimony of Lisbon's witnesses more persuasive, a decision to which we must defer. Also the Claims Court took into consideration the circumstances surrounding Mr. Marques' alleged admission and discounted its importance. We agree it does not outweigh the other evidence. Per the Claims Court, the submitted revised schedule did not depend on obtaining a change in specifications and would have been taken up had the government not ended the negotiations following the altercation. The Claims Court also held, and we agree, that the contractor's failure to give all the requested details on the revised schedule was not in itself evidence of failure to make progress on the work which would justify the default termination.

In sum, we hold that on the basis of the entire record, the Claims Court did not err in determining that the government improperly terminated Lisbon for default. The Claims Court properly converted the termination for default to a termination for convenience of the government as provided by General Provision 5 of the contract.

## IV

### Proof Of Termination Costs

The government contends that, under the correct legal standard, Lisbon failed to prove various cost items and that the Claims Court erred in including them in Lisbon's damage award. In our earlier opinion remanding this case, this court noted that the Claims Court had made inadequate findings on Lisbon's damage claim and had apparently shifted the burden of proof to the government to establish that the costs were improper, contrary to the precedent of *Willems Indus., Inc. v. United States,* 295 F.2d 822, 831, 155 Ct.Cl. 360 (1961), *cert. denied,* 370 U.S. 903, 82 S.Ct. 1249, 8 L.Ed.2d 400 (1962). In *Willems* the Court of Claims held, "[t]he claimant bears the burden of proving the fact of loss with certainty, as well as the burden of proving the amount of loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation." On remand, the Claims Court restated the basis for its allowance of the asserted items of cost. After reviewing the transcript of trial testimony and the exhibits introduced at trial, we hold that the Claims Court was clearly erroneous with respect to the allowance of several items. The government was under no obligation to present evidence attacking an item if Lisbon did not prove *prima facie* that it was properly included. On the record before us, we are compelled to conclude that Lisbon failed to make a *prima facie* showing in several instances.

General Provision 18 of the contract incorporates by reference 41 C.F.R. § 1–8.703 (1979) describing the parties' rights on termination for convenience of the government. Section 1–8.703 provides for reimbursement of the contractor for the cost and profit on work performed prior to the termination and any other reasonable cost incidental to termination of work under the contract and not otherwise recovered or credited to the government. Having reviewed the evidence and the government's arguments, we set aside the trial court's findings on the following items:

| | |
|---|---|
| Reinforcing steel (delivered—not used) market value | $ 4,186.58 |
| 6″ PVC drain pipe | 1,714.56 |
| ¾ expansion joint material | 17,882.81 |
| 55# building paper | 536.89 |
| Pourthane joint sealant | 2,213.76 |

With respect to the above items, Lisbon's witness Lancaster testified that Lisbon purchased those materials for this job, and

invoices were submitted to establish the amounts, except for the first.

The applicable federal procurement regulations impose an obligation on the contractor to "[t]ake such action as may be necessary ... for the protection and preservation of the property related to this contract which is in the possession of the Contractor and in which the Government has or may acquire an interest." 41 C.F.R. § 1-8.-703(b)(9). Further, the contractor's termination costs must be reduced by: "[T]he agreed price for, or the proceeds of the sale of, any materials, supplies, or other things kept by the Contractor or sold, pursuant to the provisions of this clause, and not otherwise recovered or credited to the Government." 41 C.F.R. § 1-8.703(h)(3).

■ Lisbon offered no evidence to explain what happened to the above materials. The government asserts that the record shows Lisbon kept them. The government points to an entry in the construction job journal for the project for May 12, 1980, which states that the contractor loaded and removed some reinforcing steel and PVC pipe, and other materials from the site. Also, prospective follow-on bidders were informed that the listed materials were available from Lisbon. Lisbon argues that it is irrelevant that it took possession of the goods because it could not use the items purchased for the project in view of the termination.

Under the regulations, a contractor is not entitled to reimbursement for the entire cost of materials simply because they were purchased for the job. The principle of mitigation of damages pervades the regulations. Moreover, Lisbon had the burden of proof on any cost item of its claim which, for those items, includes proof, *inter alia,* that the materials were not kept by the contractor or sold. It may not recover simply by pleading ignorance of the fate of those materials. On this record the trial court's finding that the items in issue were proved to be termination costs is clearly erroneous. Lisbon did not carry its burden of proving that the amounts were allowable costs.

■ The largest item which the government seeks to disallow is for "Liability for Reinforcing Steel" in the amount of $24,-348.93. To support this item, Lisbon submitted a letter from the supplier which stated that the supplier was intending to fill the follow-on contractor's order with the specially fabricated items it had manufactured for Lisbon and that, if that deal went through, Lisbon would be liable only for a balance of $24,348.93 on its account. This evidence of liability is sufficient to support the Claims Court's finding. Contrary to the government's argument, Lisbon was not required to submit a paid bill to establish this item as an allowable "cost."

■ The government's remaining arguments on damages are also without merit. It makes an argument that several cost items, which were incurred before termination, namely, the cost of wells, pump rentals, and fuel for its trailers, are not allowable because Lisbon did not "perform major items of work" during the time. The regulations provide for payment of costs of "all contract work performed prior to the effective date of the Notice of Termination." 41 C.F.R. § 1-8.703(e)(1). It is undisputed that dewatering was necessary for Lisbon to proceed. Heat for trailers is a routine expense of performance. That Lisbon was not performing "major items" of work at the time the expenses were incurred is not a basis for disallowance.

Having reviewed the record and considered all of the government's arguments, we conclude that the Claims Court was not clearly erroneous in awarding any items of cost except for the five items indicated above. In view of the items disallowed, it will be necessary, in addition, to reduce the profit figure which is computed as a percent of the cost of work incurred prior to termination. 41 C.F.R. § 1-8.703(e)(1)(iii).[10]

10. Under the regulation it does not appear that profit should have been allowed on allowable payroll which was incurred *after* the termination date. The government does not question it, and the amount is *de minimis.* We note it simply so that our decision is not taken to approve, *sub silentio,* the profit calculation in this respect.

Finally, we affirm the denial of the government's asserted setoff in the amount of $20,570 for corrective work. We do not decide the issue on the legal ground urged by Lisbon that a setoff cannot be made for corrective work where a convenience termination is involved. *See Western States Painting Co.*, ASBCA No. 13843, 69–1 BCA (CCH) ¶ 7616, 35,379 (Apr. 11, 1969); *J.D. Shotwell Co.*, ASBCA No. 8961, 65–2 BCA (CCH) ¶ 5243, 24,691–92 (Nov. 30, 1965). We do reject the government's argument that Lisbon had the burden to disprove the government's claimed setoff. The burden was on the government to prove the amount. In this case the Claims Court noted that the government proposed a finding that "the follow-on contractor ... did not have to undertake corrective measures." Lisbon agreed to some adjustment for corrective work, and the ambiguous evidence which the government calls to our attention to prove the balance does not convince us that the Claims Court's denial of the setoff was clearly erroneous.

V

Conclusion

For the reasons stated, we affirm the judgment in favor of Lisbon on its entitlement to termination for convenience costs and affirm the dismissal of the United States' counterclaim for default damages. Because we set aside the allowance of certain individual items included as Lisbon's damages, we vacate the amount of the award and remand for entry of judgment in an amount determined in accordance with this opinion.

AFFIRMED–IN–PART, REVERSED–IN–PART, VACATED–IN–PART, AND REMANDED.