# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeals of -- )
)
Campus Management Corporation ) ASBCA Nos. 59924, 59925
)
Under Contract No. SP4705-12-C-0012 )

APPEARANCE FOR THE APPELLANT: G. Matthew Koehl, Esq.
Pepper Hamilton, LLP
Washington, DC

APPEARANCES FOR THE GOVERNMENT: Ronald J. Borro, Esq.
Navy Chief Trial Attorney
Robert J. McMullen, Esq.
Trial Attorney
NAVSUP Fleet Logistics Center, Norfolk
Philadelphia, PA

## OPINION BY ADMINISTRATIVE JUDGE PROUTY

In this appeal, we consider what compensation appellant, Campus Management Corporation (CMC), is entitled to for the government's termination of its contract for convenience. We also consider the ancillary question of to what interest CMC is entitled for the government's apparently tardy payment of several invoices for services rendered on the contract that were submitted prior to its termination.

The parties waived a hearing and submitted the case upon the record pursuant to Board Rule 11. Initially, the parties only argued the issue of entitlement; however, a review of the briefing persuaded us to raise with the parties the alternative of deciding quantum at the same time as entitlement. Both parties agreed to have us decide the issue of quantum contemporaneously with our entitlement decision, and submitted additional briefs as directed.

As will be seen, CMC has the better argument with respect to the interest controversy, and is entitled to the *pro rata* share of contract performance costs for which it was ultimately paid, but its allegations regarding its other termination costs are largely (though not completely) unsupported.

## FINDINGS OF FACT

### I. The Contract and Its Performance

The above-captioned contract (the contract) was executed by the parties on 30 September 2012 (R4, tab 1 at 1). The contract was intended to obtain Student Information System (SIS) software and associated licenses and maintenance for initial use by students at the National Defense University during the 2013-2014 school year (R4, tab 1 at 4-5). To effect this, the contract had two line items for its first year: contract line item number (CLIN) 0001, for provision of the software, its licenses, and maintenance; and CLIN 0002 for associated training and implementation (R4, tab 1 at 3). The net amount for these line items was $993,389.28 (R4, tab 1 at 1, 3). The contract also included two options for additional years of support for the SIS (CLINs 1001 and 2001), priced at $298,982.76 for the first year and $307,952.28 for the second year (R4, tab 1 at 4).

On 27 September 2013, the government contracting officer (CO) executed Modification No. P00004 (Mod 4) to exercise the first additional one-year option, CLIN 1001, to obtain services for the 2013-2014 school year (30 September 2013 – 29 September 2014)[1] (R4, tab 10 at 1). Exercising option year one added $298,982.76 to the contract price (*id.* at 2), consistent with the price for CLIN 1001 in the original contract (*see* R4, tab 1 at 4). Two months later, on 25 November 2013, the parties executed Modification No. P00005 (Mod 5), affirming that CMC was responsible for delivering certain software to allow the use of third party "Blackboard" software under the SIS (R4, tab 12 at 1). The price of this modification was $37,000 (*id.* at 2).

### II. Termination of the Contract

The government issued contract Modification No. P00006, terminating the contract for the convenience of the government, on 2 May 2014 (R4, tab 15), slightly more than seven months into the performance of the contract's first option year. This modification referenced Federal Acquisition Regulation (FAR) 52.212-4(l) (FEB 2012), Termination for the Government's Convenience, which is a part of the contract (*see* R4, tab 1 at 25), and directed CMC to "immediately stop all work hereunder and...immediately cause any and all of its suppliers and subcontractors to cease work" (R4, tab 15). It further provided that CMC "shall not be paid for any work performed or costs incurred which reasonably could have been avoided (*id.*)."

---

[1] The record does not explain how the 2013-2014 school year, which the contract characterized as the "base year" (R4, tab 1 at 10-11) became the first option year, but we need not resolve that incongruity to address the disputes before us.

2

On 30 September 2014, CMC submitted a letter to the CO "formally requesting a settlement proposal" for the contract termination (R4, tab 16 at 1) which we interpret to be an actual termination settlement proposal from CMC. The letter noted an outstanding balance of $211,406.61 in "unpaid invoices for contract [Mods 4 and 5] for services rendered by [CMC] prior to notice of termination of contract" (*id.*). It also provided a "breakdown of additional costs" that CMC "incurred to satisfy the requirements for" the contract (*id.*). These additional costs summed to $648,061.27, though CMC stated that it only sought $124,576.15 of that number because that was the amount remaining on the contract for option year one (*id.* at 1-2).

The government apparently did not respond to this letter, and, on 20 January 2015, CMC submitted a one-page certified claim (with 172 pages of attachments) for $124,576.15 in termination costs (R4, tab 17). By a separate letter on the same date, CMC submitted a certified claim seeking payment of the $211,406.61 in unpaid invoices including an interest penalty in accordance with the Prompt Payment Act (PPA) (31 U.S.C. § 3903) (R4, tab 18). The CO has not issued a final decision with respect to CMC's claim for termination costs, which the government effectively concedes has been "deemed denied" (gov't br. at 2). The CO has issued no final decision on the unpaid invoices, though the government did pay all of them on 7 March 2016, except for the $37,000 that was attributed to the Blackboard integration work under Mod 5 (R4, tab 22; *see also* app. br. quantum at 2-3)[2].

*III.    CMC's Appeals To The Board*

On 8 April 2015, CMC filed two separate notices of appeal to the Board, both based upon the CO's deemed denial of its claims. The first notice of appeal, docketed as ASBCA No. 59924, was in the amount of $211,406.16 for the unpaid invoices. The second notice of appeal, docketed as ASBCA No. 59925, was in the amount of $124,576.14 for the contract termination costs. In the consolidated complaint that it subsequently filed with the Board on 27 October 2015, CMC reduced the amount that it sought under the heading of unpaid invoices by $37,000 because it determined that it had not yet completed the Blackboard integration work required by Mod 5 (compl. ¶ 14 n.1). Instead, it added $7,087.50 to its pre-existing termination cost claim, which it claimed represented the work performed on Mod 5 prior to termination of the contract (*id.*). Thus, the termination cost of the appeals increased to $131,663.64 ($124,576.14 + $7,087.50), while the amount sought by the appeals for the unpaid invoices decreased to $174,406.61 because of the reduction by $37,000.

Subsequent to the filing of this appeal, on 7 March 2016, the government paid the $174,406.61 in outstanding invoices, along with what CMC characterized as a "limited amount" of PPA interest (app. br. quantum at 2). The government agrees

---

[2] "App. br. quantum" and its government equivalent, "gov't br. quantum," refer to the supplemental briefings submitted by the parties on the issue of quantum.

with CMC that, after setting aside the amount already paid to CMC, the amount of PPA interest due to CMC for the period prior to their submission of the unpaid invoices to the CO as a claim is $2,228 (app. br. quantum at 2; gov't br. quantum at 7-8), and the government no longer opposes giving this amount to CMC although it has not yet been paid (gov't br. quantum at 7-8).[3]

## IV. Evidence Presented Regarding CMC's Damages

CMC's briefing on quantum significantly revised its approach to damages compared to the approach in its claim, primarily via adoption of the reasoning contained in the declaration of Kyle Huston, its Director of Finance, which was attached to its brief (*see* app. br. quantum, ex. 1 (Huston decl.)).[4] Mr. Huston presented evidence on multiple components of alleged damages, and we discuss them in order.

### A. The Blackboard Integration Work

Mr. Huston's declaration states that CMC employee and Project Manager, Jeremy Clement, spent 31.5 hours performing integration work as required by Mod 5 (Huston decl. at 1-2). Mr. Huston attached a two-page summary of the hours Mr. Clement worked on this project and characterized it as the "true and correct copies of Mr. Clement's time entries for this work" (*id.* at 2). This may not be completely accurate: the attached document is very plainly a summary of such entries; it is not entirely clear that it constitutes a copy of the actual recorded "time entries" for the work (*see* Huston decl., attach. A). Mr. Huston also states that Mr. Clement's fully burdened "commercial hourly rate" is $225, but provides no evidence of this beyond his statement in the declaration (Huston decl. at 2). Notably, Mr. Huston's declaration does not state what the actual cost (burdened or unburdened) of Mr. Clement's time is to CMC (*id.*). At the rate included in the declaration, the 31.5 hours that Mr. Clement worked on the Blackboard integration project would sum to $7,087 (*id.*). Notably, almost all of the hours that Mr. Clement worked on the Blackboard integration project were in the late spring and early summer of 2013 (*see* Huston decl., attach. A), while, as noted above, Mod 5 was dated 25 November 2013. Only 1.5 of the 31.5 hours worked by Mr. Clement on Blackboard integration post-dated the execution of Mod 5 (*id.*).

---

[3] Because the government conceded, by the time of its filing on quantum, that CMC is entitled to PPA interest on these payments, it must also concede that CMC is entitled to CDA interest on a valid claim relating to the late payment of these invoices.

[4] Technically, this attachment should have been submitted as a supplement to the Rule 4 file, rather than simply attached to CMC's brief. Nevertheless, because the government has not posed any objection to its attachment to the brief and addresses its merits in its opposition to CMC's brief on quantum, we will consider it.

4

The government included an attachment to its brief on quantum which addressed the hourly rates for software engineers (*see* gov't br. quantum, attach. 1). This document, a downloaded version of a portion of the General Services Administration's (GSA's) website, indicated that, for a currently-existing large scale indefinite-delivery/indefinite-quantity (ID/IQ) contract that was available government-wide, the average, fully burdened, hourly rate for a software engineer with 5 to 15 years of experience and a master's degree was $130 per hour (*id.*) and argued that amount to be a more fitting cost for such services (*see* gov't br. quantum at 10). CMC did not address this allegation in its reply brief.

## B. Early Termination Fees

Mr. Huston wrote in his declaration that, after CMC was notified of the termination of its contract, it immediately cancelled a contract for data transmission services which supported the contract and that, as a result, it incurred early termination fees from its telecommunications services provider, CenturyLink Technology Solutions (CenturyLink) (Huston decl. at 2). He attached two one-page invoices from CenturyLink to his declaration to demonstrate these fees (*see* Huston decl., attach. B). The first invoice in Attachment B to Mr. Huston's declaration is dated 16 September 2014, states that it is for the service period "8/22/2014," and includes an "Early Termination Fee" of $9,152.40 (*id.*). The second invoice is dated 21 April 2014, states that it is for the service period of "3/17/2014," and includes an "Early Termination Fee" of $377.66 (*id.*). Mr. Huston does not explain how this second Early Termination Fee could have been incurred and billed approximately two weeks prior to the 2 May 2014 notice of termination.

## C. Contract Performance Costs

Mr. Huston's declaration listed a number of expenses that he asserted were incurred "performing and preparing to perform the Option Period One requirements" (Huston decl. at 2-3). They were as follows:

### 1. Software Licenses

Mr. Huston stated in his declaration that CMC purchased $75,127 in software licenses to operate the data center utilized to perform the contract (Huston decl. at 3). According to Mr. Huston, these licenses were non-transferrable and incompatible with other CMC uses (*id.*). The invoice for the licenses, attachment C to the declaration, was dated 6 February 2014 and confirms the amount in Mr. Huston's declaration.

5

## 2. Computer Hardware Equipment

Mr. Huston also stated in his declaration that, "[j]ust before and during Option Year One," CMC purchased $172,133 worth of computer hardware and storage equipment necessary to operate the computer data center used to provide contract services (Huston decl. at 3). He further noted that this computer equipment was not otherwise usable by CMC (*id.*). Attachment D to Mr. Huston's declaration includes the 10 invoices for computer equipment that sum up to $172,132.96. The first two invoices, dated 1 August 2013 and 7 August 2013 are for $82,149 and $46,980.85, respectively (Huston decl., attach. D). The remainder of the invoices were dated after the date of the exercise of the option (*id.*).

## 3. Employee Training Fees and Associated Travel

Mr. Huston provided invoices for $7,463 in fees and travel expenses for training its employees to meet the security standards and certification requirements under the contract during option year one (Huston decl. at 4, attach. E). The receipts all appear to reflect costs that were incurred during the performance period of the option year (*see* Huston decl., attach. E).

## 4. Data Center Build-Out

According to Mr. Huston, CMC used a third-party vendor and its employees to build a data center in Dallas, Texas, to meet the standards of the contract (Huston decl. at 4). The cost for these vendors and the travel of CMC's employees was $25,573, which was supported by receipts attached to Mr. Huston's declaration (*see* Huston decl. 4, attach. F).

## 5. Data Center Shutdown

Last, Mr. Huston asserted that CMC incurred $3,398 in employee travel and third-party shipping costs when it decommissioned the data center (Huston decl. at 4). He attached receipts to the declaration demonstrating these costs to be $3,398 (Huston decl. at 4, attach. G).

## D. The Amount of Incurred Costs Recovered by Pre-Termination Billing

Mr. Huston's declaration stated that, at the time of contract termination, approximately 42% of the Option Year period remained (Huston decl. at 5). According to Mr. Huston, this meant that CMC was able to recover a significant portion of its incurred costs through the $174,405 in billing that it was ultimately paid (*id.*). Nevertheless, Mr. Huston explained that, in his "professional judgment...a minimum of 30% of [the expenses earlier annotated] were not recovered through CMC's receipt of the Option Period One payments,...or subject to avoidance by CMC" (*id.*).

According to Mr. Huston, the 30% figure was based upon the fact that CMC's expenses for the option year were "front-loaded;" that CMC was able to avoid some performance costs; and that some of the software and hardware obtained for option year one performance "had at best a limited residual value to CMC" (Huston decl. at 5). Neither Mr. Huston nor any other source of evidence before us detailed a quantifiable basis for the 30% figure from records kept by CMC, nor did CMC provide any information from its records detailing how the $174,405 in payments that it did receive had been allocated towards capital expenses, employee pay, or other costs incurred in contractual performance. Although stating that the IT hardware obtained for contract performance had only a "limited residual value," neither Mr. Huston nor any other CMC documents quantified whatever value that might have been.

*E. Profit*

Mr. Huston's declaration also noted that CMC's target profit percentage for contracts of the type presented here was 10% (Huston decl. at 6).

*F. Summary of Costs Sought and Our View of the Credibility of the Huston Declaration*

Setting aside the PPA and Contract Disputes Act (CDA) (41 U.S.C. § 7109) interest for late payment of its invoices, CMC sought the following costs based upon Mr. Huston's declaration:

| | |
|---|---|
| Blackboard Integration | $7,087 |
| Early Termination Charges from CenturyLink | $9,530 |
| Software Licenses (30%) | $22,538 |
| IT Hardware and Storage (30%) | $51,640 |
| Employee Certification Costs (30%) | $2,259 |
| Data Center Build-Out (30%) | $7,672 |
| Data Center Shutdown (30%) | $849 |

(*See* app. br. quantum at 9)

These numbers sum to $94,488 for work on option year one, plus $7,087 for the Blackboard Integration work.

For reasons to become plain in the discussion below, it is worthwhile to look at the non-discounted costs for performing option year one, as set forth in Mr. Huston's declaration. They would be:

| | |
|---|---|
| Software Licenses | $75,127 |
| IT Hardware and Storage | $172,133 |
| Employee Certification Costs | $7,643 |

7

| Data Center Build-Out | $25,573 |
| Data Center Shutdown | $3,398 |

(*See* app. br. quantum at 9)

These add up to $283,874 and include none of the labor costs or the monthly data connection fees from CenturyLink, which would have both been substantial. The reader is reminded that the entirety of the price for option year one was $298,982.76[5] – little more than a $15,000 difference with which to pay the non-"front-end" costs. From this simple exercise, we conclude that CMC would have almost certainly lost money in the event that it completely performed option year one, but the government did not exercise its second option year.[6] This material fact goes unaddressed in Mr. Huston's declaration.

This shortcoming and others give us reason to look at Mr. Huston's declaration with a skeptical eye. The declaration, as noted above, asserts that CMC incurred early termination fees from CenturyLink, which we find plausible, but the first receipt provided by the declaration pre-dates the termination by several weeks – a fact pointed out in the government's brief (*see* gov't br. quantum at 13), but not addressed in CMC's reply. Similarly, the unanswered questions regarding Mr. Clement's hourly costs to CMC give us further reason to be reluctant to take unsupported assertions in the declaration at face value. Taking these matters into account and looking at the dearth of explanation contained in the declaration regarding the calculation of the 30% figure for costs not yet recovered, we expressly find that Mr. Huston's determination of the 30% figure in his declaration is imprecise, unsupported by CMC's records, and speculative. Plainly, this finding will have ramifications to CMC's appeal as we discuss immediately below.

---

[5] To be sure, the contract price was raised by an additional $37,000 to account for the Blackboard integration services, but that task order was separate and apart from the option year one requirements as it was not billed with the option year one invoices (*see* R4, tab 10; Huston decl. (treating option year one costs differently than Blackboard integration costs); R4, tab 18 at 25 (separate invoice for $37,000, dated 31 January 2014, for Blackboard integration)).

[6] The government obliquely suggests as much in its opposition brief (gov't br. quantum at 12), but CMC did not respond to it in its reply brief.

## DECISION

We analyze first, the termination costs to which CMC is entitled and then turn to the relatively simpler question of to what amount of interest CMC is entitled for the government's late payment of its invoices.

### I.    CMC is Required to Prove Its Termination Costs Through Its Records

CMC bears the burden of proving its recovery in this appeal of the CO's refusal to pay its claimed termination amount. *SWR, Inc.*, ASBCA No. 56708, 15- BCA ¶ 35,832 at 175,225 (citing *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 767 (Fed. Cir. 1987). A contractor's entitlement to compensation in a termination for convenience is determined by those applicable clauses of the FAR that are incorporated into the contract at issue. *Rex Systems, Inc.*, ASBCA No. 59624, 16-1 BCA ¶ 36,350 at 177,216. The termination clause contained in the contract at issue here is that for the acquisition of commercial items, FAR 52.212-4(l). Under the terms of this clause, the contractor is entitled to "be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges [that]...have resulted from the termination." In our previous decisions reviewing this clause, we analyzed it as providing for reimbursement under two prongs: the first prong being for the percentage of work performed prior to the.notice of termination; the second prong being for costs (including settlement costs) resulting from the termination. *See SWR*, 15-1 BCA ¶ 35,832 at 175,223-24.

Proof of termination costs must be demonstrated by the contractor "using its standard record keeping system." FAR 52.212-4(l); *SWR*, 15-1 BCA ¶ 35,832 at 175,229. We take this requirement to mean that a contractor must provide documentation of its costs and that testimony under oath by a company officer without any such documentation does not suffice to prove such costs. *SWR*, 15-1 BCA ¶ 35,832 at 175,230 (citing *Industrial Refrigeration Service Corp.*, VABCA No. 2532, 91-3 BCA ¶ 24,093 at 120,594). Moreover, a contractor seeking termination costs is only entitled to compensation for its actual burdened labor costs, not an amount that it might charge an outside entity for that labor. *See Sentry Insurance, a Mutual Company*, VABCA No. 2617, 91-3 BCA ¶ 24,094 at 120,616.

### II.    CMC Satisfactorily Proved Few of Its Claimed Termination Costs

CMC has already been compensated by the government a *pro rata* share of its performance by virtue of its having been paid for its regular invoices submitted prior to its termination. This is the first prong of the costs permitted under FAR 52.212.4(l), as we interpreted it in *SWR*, leaving us to analyze the second prong of recoverable

costs: the reasonable charges that have been proved to have been incurred as a result of the termination. We address them below.

A. *Blackboard Integration Costs*

We agree with CMC that it is entitled to the non-recovered costs that it incurred in performing Mod 5, the Blackboard integration work. The problem is that CMC's evidence of the work performed (exclusively by its employee, Mr. Clement) and its costs is incomplete.

As we discussed above, we entertain some doubt whether the documents attached to the Huston declaration constitute records kept by CMC in accordance with its standard business record keeping system. Nevertheless, the government does not contend that they are not such records, and Mr. Huston alleges that they are. Thus, CMC's evidence manages to qualify as standard business records and we will consider the evidence to prove CMC's proper recovery. In the absence of contrary evidence, we also find that Mr. Clement worked the hours that CMC claims.

The government argues that we should not pay CMC for the hours that Mr. Clement worked on the Blackboard integration project prior to the formal issuance of Mod 5, suggesting that the cost of the work had already been recouped by payments on the contract (gov't br. quantum at 10). CMC responds, correctly, that the government provided no evidence to counter Mr. Huston's declaration that Mr. Clement's work was performed on Mod 5, and that it was reasonable for it to have performed work on the subject matter of Mod 5 in anticipation of its approval (app. reply quantum at 4-5).[7] Accordingly, we find that CMC is entitled to compensation for all 31.5 hours that it claims.

CMC does not fare as well in its contention that it should be compensated at the rate of $225 per hour for Mr. Clement's work. This is so for two reasons: first, CMC has not proved or even alleged that this "commercial rate" for Mr. Clement's work is the same thing as the cost that it incurred for his work. This is problematic because the second prong of the contract's termination clause (through which CMC is seeking this compensation) only obligates the government to compensate CMC for its costs, not the price it would charge a customer for the services. *See SWR,* 15-1 BCA ¶ 35,832 at 175,224 (interpreting FAR 52.212-4(l)); *see also Sentry Insurance,* 91-3 BCA ¶ 24,094 at 120,616. CMC's second problem lies in a deficiency in the proof of the costs

---

[7] Of course, prior to the issuance of Mod 5, this work was performed by CMC at the risk that it would not be entitled to receive compensation for it if the modification never issued. Subsequent to the execution of Mod 5, however, that changed and CMC became entitled to payment for work performed pursuant to that modification.

of Mr. Clement's work. The cost of the work (which would include the hourly fully-burdened labor cost, not just the number of hours) must be proved using its standard record keeping system and, as previously discussed above, the sworn testimony of a company official (such as Mr. Huston) without supporting documentation does not suffice as proof. *See SWR,* 15-1 BCA ¶ 35,832 at 175,230. The government offered that, under GSA schedules, a reasonable, fully-burdened rate for the work performed by Mr. Clement was $130 per hour, although it did not concede that CMC should be paid that (or any) amount (gov't br. quantum at 10). CMC did not address the government's response on this matter in its reply brief. In our view, the $130 per hour posited by the government as a reasonable cost of Mr. Clement's work is, in fact, a reasonable rate and using it would be fair to CMC. Thus, we hold that CMC is entitled to $4,095 ($130 per hour multiplied by 31.5 hours) for the Blackboard integration work of Mod 5.

### B. Charges Resulting from the Termination

The early termination costs sought by CMC were limited to the CenturyLink early termination fees. The government has given us no reason to doubt the testimony of Mr. Huston that CMC incurred such fees from its early termination of its data transmission contracts with the company. However, there is no explanation for how the earlier of the two invoices presented by CMC, in the amount of $377.66, dated on 21 April 2014 for the "3/17/2014" service period, could have possibly been caused by the termination of the contract, which it predates. Though this concern was raised by the government's brief (*see* gov't br. quantum at 13), CMC made no effort to address it in its reply filing. We thus conclude that this invoice does not reflect a compensable termination cost.

With respect to the invoice in the amount of $9,152.40, dated 16 September 2014 for the service period "8/22/2014," we determine that it is most likely for compensable termination costs and award it. To be sure, CMC did not make this decision as easy as it should have been (indeed, it is a close evidentiary call), but Mr. Huston's testimony persuades us that this reflected a real incurred cost, and it is not unreasonable for an early termination fee to have been imposed and paid a few months after the actual termination notice.

This is the last termination cost that we will allow in this appeal.

### C. Performance Costs

All of the other compensation sought by CMC through Mr. Huston's declaration was for "front-end loaded" costs that CMC asserts were necessary for performance of the contract's option year. Mr. Huston posits that, across the board, CMC had recovered all but 30% of these costs. As we found, above, the 30% figure

11

was imprecise, unsupported, and speculative. As such, and particularly given its lack of demonstrable foundation in CMC's business records, we find that, notwithstanding Mr. Huston's testimony, CMC has not met its burden of proving its damages related to performance costs and we consequently make no award to CMC of such costs.[8] *See SWR*, 15-1 BCA ¶ 35,832 at 175,230 (citing *Industrial Refrigeration Service*, 91-3 BCA ¶ 24,093 at 120,594).

### III. CMC is Entitled to the Disputed CDA Interest on the Late-Paid Invoices

CMC approaches the interest it is due on its late-paid invoices by considering them to be subject to PPA interest up until the time that it submitted its claim, and then, consistent with the applicable regulatory framework, *see* 5 C.F.R § 13156.10(a)(5)(i), CDA interest from the time of claim submission until its payment (app. br. quantum at 2-3).[9] The government concedes its obligation to make the PPA interest payment, but contends that, since the payment of invoices was never truly in dispute, it should be free of the obligation to pay CDA interest to CMC after the submission of the claim (gov't br. quantum at 7-9). The government is wrong.

The government's position is grounded upon the notion that a dispute is a necessary element of a claim under the CDA and that, without a valid claim, there is no CDA interest (gov't br. at 20-21; gov't br. quantum at 8-9). Never mind that the government never sought dismissal of the appeal relating to unpaid invoices (ASBCA No. 59924) for lack of jurisdiction under the CDA. Also, never mind that the government remains perfectly content to consider the filing of the allegedly invalid claim as the date that PPA interest should stop accruing. In any event, it is clear that appellant did present a valid CDA claim.

In its brief on entitlement, the government cited *Parsons Global Services, Inc.*, ASBCA No. 56731, 11-1 BCA ¶ 34,632, for the proposition that a dispute over costs is a prerequisite for a valid CDA claim (gov't br. at 20). The government even quoted the penultimate paragraph in that opinion to support the notion that a valid CDA claim required a dispute (*see id.* (citing *Parsons Global Services*, 11-1 BCA ¶ 34,632 at 170,656)). In the circumstances of that appeal, dispute over entitlement was, indeed, the key to its resolution. But *Parsons Global Services* also noted that an invoice could

---

[8] To be clear, we entertain serious concerns, as explained in our findings above, that CMC would have lost money had it performed the entirety of the First Option Year and been paid the full amount set forth in the contract for such work. Nevertheless, we have no way of calculating how much it would have lost and need not engage in such speculation here to conclude that CMC has not proved its entitlement to the amount of money that it seeks in this portion of its appeal.

[9] CMC does not seek payment of CDA interest on the PPA interest; just upon the principal.

become the subject of a claim "if disputed *or* the government unreasonably delays payment of the invoice." 11-1 BCA ¶ 34,632 at 170,654 (citing *Reflectone Inc. v. Dalton*, 60 F.3d 1572, 1579-80 (Fed. Cir. 1995) (emphasis added; additional citations omitted)). CMC has fairly contended that the government unreasonably delayed the payment of its invoices here. It thus possesses a valid claim to which CDA interest applies from the time of the claim until payment, and we hold that it is entitled to such interest.

## CONCLUSION

With respect to ASBCA No. 59925, CMC is entitled to the payment of $4,095 for its work on Mod 5 and $9,152.40 in early termination costs. These are subject to CDA interest from the date that CMC's claim was received by the CO, 20 January 2015. The remainder of its appeal relating to the termination for convenience is denied for lack of sufficient proof.

With respect to ASBCA No. 59924, CMC is entitled to $2,228 in PPA interest upon its late-paid invoices for the time prior to the CO's receipt of its claim (as the government concedes), and CDA interest upon the $174,406.61 in late-paid invoices from the date of the CO's receipt of its claim, 20 January 2015, until their payment on 7 March 2016. Thus, this appeal is sustained, in part, and this matter is returned to the parties for the calculation of interest in accordance with this decision.

Dated: 20 April 2017

J. REID PROUTY
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

13

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 59924, 59925, Appeals of Campus Management Corporation, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals
