# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of -- | ) | |
| | ) | |
| Grow Life General Trading, LLC | ) | ASBCA Nos. 60398, 60467, 60778 |
| | ) | |
| Under Contract No. W912D1-15-P-0051 | ) | |

APPEARANCE FOR THE APPELLANT:  Mr. Hazrat J. Rahmatzai
      Managing Director

APPEARANCES FOR THE GOVERNMENT:  Raymond M. Saunders, Esq.
      Army Chief Trial Attorney
    Harry M. Parent III, Esq.
    CPT Jeremy D. Burkhart, Esq.
    Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE WOODROW

This appeal arises from Contract No. W912D1-15-P-0051 (the contract) between appellant, Grow Life General Trading, LLC (Grow Life or appellant), and the Army Area Support Group-Kuwait (Army or government) for providing household furniture to two locations in Kuwait in order to accommodate a surge of troops deploying in support of Operation Inherent Resolve – Iraq.

Grow Life challenges the Army's partial termination of the contract for cause in ASBCA No. 60398. It also seeks $1,180,563.72 in delay damages due to the Army's purported refusal to accept delivery of Grow Life's furniture shipments. We docketed Grow Life's monetary claim as ASBCA No. 60467. Subsequently, Grow Life appealed the contracting officer's (CO's) denial of Grow Life's monetary claim. We docketed the appeal as ASBCA No. 60778 and subsequently consolidated the three appeals. Grow Life filed an amended complaint dated June 5, 2017, increasing its monetary claim from $1,180,563.72 to $3,569,471.27, for additional costs associated with storing shipping containers holding the undelivered furniture. We deny the appeals.

## FINDINGS OF FACT

### A. The Parties and Key Individuals

1. Grow Life is a logistics services company based in the United Arab Emirates (UAE). Since 2001, it has provided professional services in the fields of petroleum product supply, furniture supply, and transportation. (App. br. at 4)

2. Mr. Hazrat Rahmatzai, appellant's president, has approximately ten years' experience with U.S. Government contracts (tr. 2/12). Mr. Rahmatzai signed the contract at issue in this appeal on behalf of appellant (tr. 2/84). Prior to this contract, he had one other contract in Kuwait, supplying construction materials to Camp Arifjan (tr. 2/84). The materials for that contract were imported from China, but his supplier handled all of the customs requirements (tr. 2/84-85). Prior to this contract, he had no experience dealing with Kuwaiti customs (tr. 2/85).

3. Appellant's agent in Kuwait was Elisha Almeida, senior sales coordinator for Frontline Logistics (supp. R4, tab 44; tr. 2/100). Ms. Almeida was not familiar with the different types of visas in Kuwait (tr. 2/113) and appellant does not know whether Ms. Almeida personally had installation access for Camp Arifjan or Camp Buehring (tr. 2/99-102).

4. On the Army side, MAJ Fisher was the CO when the contract started. CPT Scovell was the contract specialist. (Tr. 2/88)

5. CPT Melissa Winterfeldt was the housing officer in charge from April 14, 2014 through August 29, 2016, with additional duty as the CO's representative for this contract (tr. 2/88, 3/49-50). She was in charge of all housing on the three bases in Kuwait – Camp Arifjan, Camp Buehring, and Kuwait Naval Base. This involved housing for all American and Coalition forces coming to or passing through Kuwait (tr. 3/50). CPT Winterfeldt was part of the requiring activity, the unit that ultimately needed the furniture (tr. 3/52).

6. Ms. Charina Rosete was the furnishing lead for CPT Winterfeldt (tr. 3/50). She was a contractor employee who had been working for the U.S. Army in Kuwait for ten to twelve years prior to CPT Winterfeldt's arrival, and she was the subject matter expert on anything furniture-related needed in the country (tr. 3/50).

7. MSGT Ukhueligbe was CPT Winterfeldt's housing non-commissioned officer in charge (NCOIC) at Camp Arifjan (tr. 3/50-51).

8. SFC Segrain was CPT Winterfeldt's housing NCOIC at Camp Buehring (tr. 3/51).

B.    The Contract

9. On August 9, 2015, the Army awarded Contract No. W912D1-15-P-0051 to appellant for the delivery of furniture to two locations in Kuwait – Camp Arifjan and Camp Buehring (R4, tab 7). The commercial items contract with 14 contract line item numbers (CLINs) was awarded for a total amount of $829,603.16, with a delivery date of September 5, 2015 (R4, tab 7 at 4-12). There were 13 CLINs for furniture and 1 CLIN was for insurance (*id.*).

2

10. On August 10, 2015, Mr. Rahmatzai signed the contract on behalf of appellant (R4, tab 7 at 1). Mr. Rahmatzai testified that he read and understood the entire contract before he signed it (tr. 2/86-87).

11. The contract called for the delivery and installation of a variety of furniture items, including 4,945 mattresses (CLINs 0001, 0002, and 0005), 2,775 metal bed frames (CLINs 0007 and 0008), 50 leather chairs (CLIN 0003), wooden furniture (CLINs 0004, 0006, 0009, 0010, 0011, and 0012), and 3,100 metal wall lockers (CLIN 0013). For each furniture CLIN, the contract specified "FOB: Destination" and that "Destination Contractor shall deliver, unpack, install and place items as directed by the acceptor." (R4, tab 7 at 3-9)

12. Prior to award, on August 8, 2015, at the request of the Army, Grow Life submitted a delivery schedule. The delivery schedule divided the CLINs into columns indicating "delivery time in 24 hours" and "delivery time in 2-3 weeks." According to Grow Life's schedule, all items for CLINs 0002-0005 could be delivered in 24 hours. The schedule stated that 800 of 4,775 mattresses under CLIN 0001 could be delivered in 24 hours, along with 10 of 60 TV stands under CLIN 0011. All remaining items, including all items under CLINs 0006-0010 and 0012-0013, could be delivered in 2-3 weeks. (R4, tab 36 at 5)

13. Grow Life's proposed delivery schedule was never made part of the contract. The only date specifically referenced in the contract was the delivery date of September 5, 2015 (tr. 3/25-26).

14. The contract incorporated by reference several Federal Acquisition Regulation (FAR) and Kuwait Special Contract Requirements (KSCR) clauses relevant to this appeal. For example, the following relevant clause FAR 52.212-4, CONTRACT TERMS AND CONDITIONS — COMMERCIAL ITEMS (MAY 2015) was incorporated into the contract. (R4, tab 7 at 12)

15. FAR 52.212-4(f), set forth below, provides that appellant is liable for default unless nonperformance is caused by an occurrence beyond its reasonable control and without its fault or negligence. Pursuant to this clause, appellant was required to notify the CO in writing as soon as reasonably possible upon the commencement of any delay and to give prompt written notice of the cessation of delay.

> (f) *Excusable delays.* The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of

3

common carriers. The Contractor shall notify the Contracting Officer in writing as soon as it is reasonably possible after the commencement of any excusable delay, setting forth the full particulars in connection therewith, shall remedy such occurrence with all reasonable dispatch, and shall promptly give written notice to the Contracting Officer of the cessation of such occurrence.

16. FAR 52.212-4(j)(2), set forth below, places risk of loss on appellant until delivery of the supplies to the government at the destination specified in the contract, as the contract was f.o.b. destination.

(j) *Risk of loss*. Unless the contract specifically provides otherwise, risk of loss or damage to the supplies provided under this contract shall remain with the Contractor until, and shall pass to the Government upon:

(1) Delivery of the supplies to a carrier, if transportation is f.o.b. origin; or

(2) Delivery of the supplies to the Government at the destination specified in the contract, if transportation is f.o.b. destination.

17. FAR 52.212-4(m), set forth below, provides that the government may terminate the contract for cause in the event of any default, or for appellant's failure to comply with any contract terms and conditions, or appellant's failure to provide adequate assurances of future performance upon request.

(m) *Termination for cause*. The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance. In the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contractor shall be liable to the Government for any and all rights and remedies provided by law. If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

4

18. The contract also contained specific provisions related to doing business in Kuwait, including provisions related to installation access and Kuwaiti customs. In particular, the contract included KSCR 1-13, INSTALLATION SECURITY/ACCESS/BADGING REQUIREMENTS (AUG 2010), setting forth specific instructions regarding badging necessary for personnel to access Army posts in Kuwait:

> (a) Badging and access requirements for Army Posts in Kuwait will require coordination with the Contracting Officer or the Contracting Officer Representative (COR) responsible for contract oversight at applicable location.
>
> (1) To obtain entry to Camp Arifjan, Contractors must contact the Badging Office at 965-2389-1525 for forms, procedures, and instructions.
>
> (2) New passes are obtained at ECP 1 (TCN Gate) on Camp Arifjan. Renewals and upgrades are handled at the Provost Marshal Office Building 159 located on Camp Arifjan. The ECP 1 Badging Office provides support from 0700 to 1600 and 1900 to 0400 daily.
>
> (b) Contractors are advised that badging for citizens/residents of certain countries is restricted or unavailable. Contractors must contact the Badging Office to obtain a list of restricted countries and any applicable waiver processes.

(R4, tab 7 at 22)

19. The contract also included KSCR 1-8, CONTRACT DELIVERY, TRANSPORTATION AND CUSTOMS REQUIREMENTS (AUG 2010), containing instructions for shipping and customs clearance.

> (e) SHIPPING METHOD: Shipments arriving by express couriers DHL, FedEx, or UPS are processed using AK 302-1 Form, prepared by the express courier and given to the customer for signature. The signed form is then brought to the HNAC office for clearance through the KGAC. No AWB is required, only the signed AK form.
>
> (f) KUWAIT CUSTOMS CLEARANCE: Required to ensure smooth transfer of goods between the U.S. Army in Kuwait and the General Administration of Customs (KGAC) of the State of Kuwait under the Defense Cooperation

5

Agreement (DCA). Customs procedures will address import and export of all cargo to and from the U.S. Army, Navy, Air Force and Marines by Air, Land or Sea.

CUSTOMS POINT OF CONTACTS:
DHA Customs Office
Bldg 216 room 104
Camp Arifjan-Kuwait
Office: DSN 011-965-2-389-2417 or 5978

....

(2) Contractor's Responsibilities: The Contractor shall be responsible for all customs clearance actions. All necessary arrangements, clearance procedures, and coordination with the Host Government customs, will be the sole responsibility of the Contractor. The Contractor shall submit to the Contracting Officer, with a cover letter, information copies of the shipping documents for the shipment(s) involved. As a minimum, the following shall be included as enclosures, with the cover letter to the Contracting Officer in three (3) copies:

(i) Invoice. (Include a copy in Arabic)
(ii) Bill of Lading.
(iii) Certificate of Origin.
(iv) Statement on the cover letter as to Port of Customs Clearance, estimated arrival date, general description of the shipment, quantity and the name of the carrier.
(v) Serial number or model number of shipment items.

(3) Physical Handling of Materials: The Contractor shall be responsible for performance of all loading, unloading, transportation or other physical handling of materials as may be required, including all movement from carrier unloading site to delivery at the job site and all movement required at the customs area.

(R4, tab 7 at 23-24)

20. CPT Winterfeldt testified that it was the vendor's responsibility to deal with Kuwaiti customs:

6

Q. [Repeating Mr. Rahmatzai's question]: Whose responsibility was it to check with Kuwaiti customs, yours or the vendor agent's responsibility?

A. I believe it was the vendor's responsibility. In all of the other contracts that I had done while I was over there, the vendor always dealt with customs and I never had an issue with anything else coming on base or getting through customs.

(Tr. 3/86) Grow Life failed to offer any credible testimony to refute this evidence.

21. The parties modified the contract twice after award. Modification No. P00001, dated August 13, 2015, increased the award amount by $192,024 based on an increase in the size of the black metal bed frames in CLIN 0008. Modification No. P00001 also made an administrative change to the description of CLIN 0014, the insurance, and added CLIN 0015, Contract Manpower Reporting. No change was made to the delivery date. (R4, tab 11; tr. 2/90-95) While Modification No. P00001 was meant to change the size of the bed frames, it failed to actually change the contractual description of the bed frames (R4, tab 11).

22. Modification No. P00002, effective August 14, 2015, corrected the CLIN 0008 description to reflect the change in the size of the black metal bed frames from 150cm x 200cm to 90cm x 190cm. Modification No. P00002 did not change the contractual delivery schedule, which remained September 5, 2015, as set forth in the original contract. (R4, tab 7 at 8, 10-12) Appellant signed both Modification Nos. P00001 and P00002 on August 16, 2015 (R4, tabs 11, 13).

C. Performance

23. When appellant provided its schedule to the Army on August 8, 2016, it represented it could locally procure 970 mattresses (CLINs 0001, 0002, 0005), 50 leather chairs (CLIN 0003), 5 mahogany TV stands (CLIN 0004) and 10 oak TV stands (CLIN 0011) within 24 hours. Appellant also stated that it could deliver all of the remaining items within 2-3 weeks. (R4, tab 36 at 5)

24. Appellant testified it takes approximately 15 to 20 days for a shipment from China to reach Kuwait (tr. 2/131-32).

25. According to appellant's own timeline, it shipped furniture in eleven containers across four separate shipments; the first from its warehouse in the UAE, followed by three from China (R4, tab 74; tr. 2/121).

7

## 1. First Shipment of 480 Metal Beds from UAE

26. On August 17, 2015, Ms. Charina Rosete, the Army's warehouse furnishing lead, emailed appellant and requested confirmation of delivery dates. Mr. Rahmatzai responded:

> For now Metal Frame Beds are ready for the delivery it takes
> 7 days to arrive to Camp [Buehring] please let me know are
> you willing to receive all the metal frame beds [i]n one
> lot/time? I will let you know about the exact date of delivery
> for the rest of items step by step once it gets ready for the
> delivery.

(Supp. R4, tab 52)

27. On August 22, 2015, Mr. Rahmatzai emailed CPT Winterfeldt stating the first delivery of 480 beds would be coming in a single 40-foot container to arrive on August 30, 2015, with the rest of the beds to arrive in port on September 12, 2015. Mr. Rahmatzai further stated that: "along with this we will also deliver the Mattresses and lockers it will not take[] more 20 September 2015 for the rest of furnitures [sic] the complete delivery will also get done within 20 September 2015." (R4, tab 38 at 3-4)

28. On August 23, 2015, appellant sent an email to Ms. Rosete, the housing lead for CPT Winterfeldt, with pictures of mattresses stating: "50 each compressed in one pallet total 24 pallet in 40ft container." Ms. Rosete responded: "The mattresses are acceptable. As discussed, all the mattresses (4,775) will be delivered to Camp Buehring." (Supp. R4, tab 53)

29. Appellant also emailed pictures of the metal wall lockers and stated: "1 pc in one carton 500 pcs in 40ft. Container," to which Ms. Rosete responded the lockers are acceptable but must be assembled upon delivery, and that 2,400 will be delivered to Camp Buehring and 700 to Camp Arifjan (supp. R4, tab 54).

30. On September 14, 2015, the first container arrived in Kuwait from Jebel Ali, UAE, with bill of lading MSLJEASWK0153. The date of issue of the bill of lading is not apparent in the English translated portions of the document. (Supp. R4, tab 57 at 1-3) This shipment contained the 480 beds appellant ultimately delivered on October 20, 2015, more than one month after the shipment's arrival in Kuwait.

31. On September 14, 2015, Ms. Rosete requested that appellant provide exact delivery dates for its deliveries (supp. R4, tab 43).

32. On September 14, 2015, appellant mailed the customs paperwork – consisting of Form AK 302 – for the shipment to MSGT Ukhueligbe (supp. R4, tab 55 at 5).

33. Two days later, on September 16, 2015, MSGT Ukhueligbe responded that the form was processed (supp. R4, tab 55). However, later the same day, Ms. Almeida informed MSGT Ukhueligbe that the Form AK 302 was not processed, because the host nation (Kuwait) requested the original master bill of lading, which would be handed over the next day at the airport (supp. R4, tab 56).

34. On October 4, 2015, appellant submitted a new customs packet (AK 302) for the shipment (supp. R4, tab 60).

35. On October 8, 2015, MSGT Ukhueligbe acknowledged that he had overlooked the customs packet, but that he currently was working on it (supp. R4, tab 61 at 1).

36. On October 20, 2015, Mr. Rahmatzai emailed CPT Winterfeldt and asked her to call Ms. Almeida to coordinate a time to pick up and sign the amended customs documents. The next day, on October 21, CPT Winterfeldt replied that it is appellant's responsibility to assemble and submit papers. Appellant acknowledged it bore responsibility to prepare the paperwork, with CPT Winterfeldt's responsibility limited to signing off on the paperwork. CPT Winterfeldt said she would leave a copy with Ms. Rosete for pickup. (Supp. R4, tab 65)

37. The same day, October 21, 2015, SFC Segrain informed CPT Winterfeldt that the bed frames had been delivered, but were not set up (supp. R4, tab 68).

38. Grow Life did not install or assemble the metal bed frames. Instead, the government paid for installation and assembly of the 480 bed frames (supp. R4, tab 68 at 1).

2. Second Shipment of Wall Lockers and Mattresses from China

39. On October 2, 2015, three containers arrived from Shekou, China, with bill of lading 2564433790, dated September 4, 2015 (supp. R4, tab 74). The bill of lading had "filing cabinets" crossed out and "wall lockers" typed in its place. The shipment contained wall lockers and spring mattresses. (Supp. R4, tabs 60, 84)

40. Appellant first emailed the customs paperwork for this shipment to the government on October 4, 2015 (supp. R4, tab 60).

41. Specifically, CPT Winterfeldt and Mr. Rahmatzai exchanged a series of emails discussing whether the shipment contained wall lockers or filing cabinets (supp. R4, tab 62).

42. On Thursday, October 8, 2015, Ms. Almeida followed up by email on the status of the AK 302 customs declaration form submitted for appellant's second

9

shipment. MSG Ukhueligbe stated he originally skipped this email thinking it was a request for base access, but was currently working on it. (Supp. R4, tab 61)

43. A back-and-forth email chain ensued from October 8-10, 2015, over whether the shipment contained wall lockers or filing cabinets (supp. R4, tab 62).

44. On October 13, 2015, CPT Winterfeldt informed Mr. Rahmatzai that his agent Ms. Almeida was not being cooperative in submitting correct customs and badging documentation (supp. R4, tab 50). A week later, on October 20, 2015, appellant asked CPT Winterfeldt to call Ms. Almeida to coordinate a time to pick up the amended customs paperwork. The next day, CPT Winterfeldt responded it was appellant's responsibility to bring the papers to her. (Supp. R4, tab 65) Four days later, on October 25, 2015, appellant again requested CPT Winterfeldt to arrange to meet a contact to receive paperwork, and the next day CPT Winterfeldt again responded that appellant needed to come during business hours to have the papers signed (supp. R4, tab 69).

45. On October 27, 2015, appellant's agent delivered the customs documents to CPT Winterfeldt, but she rejected the documents because they were not originals and appeared to be altered. Appellant provided original documents the next day, October 28, 2015. (Supp. R4, tab 70 at 1-2)

46. On October 29, 2015, CPT Winterfeldt signed the original documents and personally took them to the customs office. However, the Kuwaiti customs office informed CPT Winterfeldt that the AK 302 form was incorrect because the listed carrier did not match the rest of appellant's paperwork. (Supp. R4, tab 70 at 6)

47. Appellant sent an updated version of the customs paperwork via email, and CPT Winterfeldt again explained that she needed an original (supp. R4, tab 70 at 9).

48. Grow Life never obtained approval from Kuwaiti customs for this shipment, and it remained in port in Kuwait.

### 3. Third Shipment of Furniture from China

49. On October 9, 2015, appellant's third shipment arrived, with two containers, from Shekou, China (supp. R4, tab 74). This shipment contained wall lockers, spring mattresses, metal and wood furniture. Like the second shipment, the bill of lading had "filing cabinets" crossed out and "wall lockers" typed in its place. (Supp. R4, tab 85)

50. Grow Life first emailed the customs paperwork for this shipment to the government on October 25, 2015 (supp. R4, tab 69 at 1). The next day, CPT Winterfeldt reiterated that original documents needed to be delivered to her office, and pointed out errors, including an incorrect point of contact, listed on the forms appellant submitted (*id.*).

10

51. Grow Life never completed the customs paperwork for this shipment, and it remained in port in Kuwait. As of November 15, 2015, the date the contract was terminated pursuant to Modification No. P00003 (R4, tab 9 at 1, 6, 11), Grow Life had 2,200 beds, 1,370 mattresses, and 1,230 wall lockers sitting in port in Kuwait (R4, tab 19; tr. 2/133-34). The contract called for 4,945 mattresses. The other 3,575 mattresses were in Grow Life's Dubai warehouse as of November 15, 2015, along with the remaining wall lockers and beds (tr. 2/134). Ultimately, Grow Life delivered only 480 black metal bed frames under CLIN 0008.

### 4. Problems with Base Access and Kuwaiti Customs

#### i. Customs Clearance

52. Appellant testified that the phone numbers it had for customs did not work: "This is the section which was directed to Krishna Kumar, who was doing the logistics. And he tried these, all numbers, all the way." (Tr. 2/97)

53. Appellant never visited the office listed in the contract as the point of contact for assistance with customs:

> Q. Yes, and I understand you asked the Government several times for the phone number. But when is the first time when someone from Grow Life actually went to Building 216, Room 104?
>
> A. We didn't went [sic] to that office directly.

(Tr. 2/96-97)

54. At the hearing, Mr. Rahmatzai admitted that he had no prior personal experience with obtaining customs clearance for shipments into Kuwait. However, he stated that he had an associate, Mr. Krishna Kumar, responsible for handling logistics, including customs paperwork. (Tr. 2/85-86) Mr. Kumar was located in Dubai, not Kuwait, and did not go in person to the government office (tr. 2/96). Instead, Grow Life relied on Ms. Almeida, with Frontline Logistics, as Grow Life's agent to shepherd its shipments through the Kuwaiti customs approval process (tr. 2/38).

55. Mr. Rahmatzai does not know whether his agent Ms. Almeida ever attempted to visit the customs office (tr. 2/97-98).

56. Mr. Rahmatzai sought a "tax exempt letter" from the government that, he claimed, would have exempted the furniture from customs duties and obviated the need for customs paperwork. Mr. Rahmatzai referred to this exemption letter as DA Form 1687. (Tr. 1/62, 2/28-29)

11

57. DA Form 1687 is an internal Army document for delegating signature authority from the CO or contracting officer representative (COR) to other Army persons to request and sign custom documents (app. supp. R4, tab 3).

### ii. Access and Badging

58. On August 22, 2015, Grow Life asked about the procedure for installation access. On August 24, 2015, CPT Winterfeldt responded by explaining that:

> I will not be badging them, nor do I have any part in badging them. You need to do that on your own through security. Please go through the proper channels, because I do not do anything with security or badging.

(Supp. R4, tab 38)

59. On August 23, 2015, Grow Life responded, stating that "[w]e never promised that our employees have the badges and I don't think we would need badges for employees." Grow Life further stated that its truck drivers could unload the furniture and "if some installations is required inform us and just provide us the one time gate memo pass for our workers and they will come and install it for you." (Supp. R4, tab 38 at 2)

60. On August 24, 2015, CPT Winterfeldt responded:

> With new heightened security, all personnel need badges. Again, I need you to go through your channels on getting badged. This is not something that is done at my level. They will not allow anyone on base without a badge. A memo will not suffice, and it will not allow you on base.

(Supp. R4, tab 38 at 2)

61. On September 6, 2015, Ms. Rosete forwarded an email to appellant explaining the process for badging and providing a copy of ASG-KU Department of Engineering Services (DES) Form 190-16.01 Access Application. The original email, from CPT Scovell with the Army's Regional Contracting Command, stated:

> It takes at least three days to receive temporary access and that's if all the documents are perfect. That is why you should schedule the meeting at least a week out in order to fix any deficiencies.

(Supp. R4, tab 42)

62. On September 14, 2015, appellant's agent, Ms. Almeida, proposed using military escorts instead of badged workers:

> As discussed, to obtain the gate pass for the labors
> [sic] is a very lengthy process, the other option will be to
> escort the labors from the gate to the base. For which we
> would provide the passport copy, visa copy & civil ID
> copy of the person. The same will be provided 3-4 days in
> advance. Pls. confirm.

(Supp. R4, tab 44)

63. On September 30, 2015, Ms. Almeida requested military personnel escorts in order to avoid the badge application process. She was informed that escorts were not available, and she submitted installation access applications the same day. (Supp. R4, tab 45)

64. On October 2, 2015, SFC Segrain informed Ms. Almeida that her badge applications were denied, because the DES form was incorrectly filled out, and because the applicants lacked the requisite visas. The applicants had Kuwait Visa 20; however, a Kuwait Visa 14, 17, or 18 was required for base access. The workers apparently had Kuwait residency visas when they actually needed work visas. (Supp. R4, tab 47)

65. The next day, October 5, 2015, Ms. Almeida emailed SFC Segrain and informed him: "currently we do not have labor holding below mentioned visa status." SFC Segrain replied that if she could not provide the required documents for base access, she needed to contact the contracting command to discuss further. (Supp. R4, tab 48)

66. On October 10, 2015, SFC Segrain sent another copy of the DES access form to Ms. Almeida and asked her to complete it. The email states "we both agreed that the date be move[d] to 17 OCT 15 to 30 OCT 15." (Supp. R4, tab 49)

67. On October 13, 2015, CPT Winterfeldt emailed appellant and asked to have completed paperwork by the end of the week:

> In addition to the customs paperwork, Ms. Elisha
> [Almeida] from Frontline is refusing to cooperate with my
> NCOs (SFC Samuel Segrain) and will not provide any of the
> correct documentation for base access. We have been going
> back and forth for too long on this, and I am demanding that
> we have the correct information by the end of this business,
> week (15 OCT 15)....

(Supp. R4, tab 50)

68. On October 16, 2015, SFC Segrain informed appellant that installation access was approved for the workers involved with the first shipment of 480 metal bed frames (supp. R4, tab 5 at 38, 51).

69. Grow Life successfully delivered the 480 bed frames, but its workers did not assemble them. Instead, the government paid for installation and assembly of the 480 bed frames. (Supp. R4, tab 68 at 1)

70. The government refused to pay for Grow Life's Defense Base Act (DBA) insurance under CLIN 0014, on the grounds that Grow Life did not install the bed frames (R4, tab 18; tr. 1/48, 3/85).

71. Mr. Rahmatzai testified that Grow Life "tried every phone, every door" to obtain information on badging (tr. 2/99). No one from Grow Life visited the badging office located on Camp Arifjan. According to Mr. Rahmatzai, that was because Grow Life's representatives lacked installation access: "Every route, they tried. But as far, Building 159, located on Camp Arifjan, the ECP1, you have no rights. ECP1, without a badge, who can go there? How to go to this without a badge?" Mr. Rahmatzai does not know whether his agent, Ms. Almeida, had installation access. (Tr. 2/99-102)

72. At the hearing, Mr. Rahmatzai indicated that he did not have personal knowledge of the different types of Kuwaiti visas (tr. 2/113).

D. Cure Notice

73. On October 26, 2015, the CO issued a cure notice to appellant. It stated: "the Government considers your performance a condition that is endangering performance of the contract" and provided appellant 10 days to cure the condition. The cure notice documented four issues:

- The AK 302 and badging documents were addressed with the need to provide proper documents to CPTWinterfeldt.
- The description of commodities in paperwork was to be documented in accordance with each CLIN.
- For deliveries, all commodities were to be delivered, unpacked, installed, and placed in accordance with the contract.
- An obligatory timeline was set, requiring deliveries to occur between November 2, 2015 and November 28, 2015.

(R4, tab 17)

14

E.  Partial Termination for Cause

74.  By October 30, 2015, all of appellant's containers from China were in port in Kuwait; however, appellant did not deliver or install any furniture beyond the 480 metal beds (tr. 2/120-24).

75.  Grow Life's containers arrived in port in staggered shipments between September 13, 2015 and October 27, 2015.  Appellant explained why the shipments were staggered: "I stopped to see the containers I have how long it takes" (tr. 2/126).  Appellant claimed his original target delivery date was September 20, 2015 (tr. 2/126-27), and that it was a business decision to stagger the container shipments:

> Q.  So it was Grow Life's business decision not to ship all of the containers at the same time to Kuwait?
> A.  Yes.
> Q.  If you had shipped all of the container[s] at the same time, would they likely have arrived around 13 September 2015 when the first container arrived?
> A.  Yes.  If the delivery schedule -- if the government contracting official, COR, if they were positive with me, yes. Here is the point.  Here is the point.

(Tr. 2/130-31)

76.  On November 3, 2015, Grow Life responded to the October 26, 2015 cure notice, stating that 11 containers had arrived in Kuwait between September 5, 2015 and October 27, 2015.  Grow Life stated that it could have all paperwork issues resolved by Monday, November 8, 2015, and that it could complete delivery and installation of the furniture by the early finish date of November 28, 2015, or, at the latest, by December 4, 2015.  (Supp. R4, tab 73)

77.  Grow Life's proposed late finish date of December 4, 2015, was more than a week beyond the November 28, 2015 deadline set forth in the cure notice.

78.  CPT Winterfeldt testified that appellant was given an opportunity to respond and comply with the cure notice (tr. 3/79).  She further testified that the decision to terminate was made after November 2, 2015:

> Q.  Captain Winterfeldt, the cure notice that was sent on 26 October listed the first delivery for Appellant to make on 2 November.  Do you know whether the decision to terminate the contract was made after 2 November?

15

A. I believe so. And I only say that because Sergeant First Class Segrain was at Camp Buehring at the gate ready to escort them in on that date. And three days in a row they came back and weren't able to deliver. And then when they delivered, they had nobody to put anything together and did not have the full amount of the bedframes even there. And I believe that's when Army Contracting Command started to see that they had not met their obligations. So, it had to be after that date.

(Tr. 3/85)

79. When Grow Life attempted to contact CPT Winterfeldt, she told Grow Life to contact CPT Scovell at contracting command (tr. 3/80).

80. On November 9, 2015, CPT Scovell informed Grow Life that the government would not pay DBA insurance under CLIN 0014, because the contractor did not install the 480 bed frames delivered under CLIN 0008 (R4, tab 18).

81. Appellant's memorandum, dated November 10, 2015, subject: "US Military Caused Delays under Contract W912D1-15-P-0051/Mod. P0002," sets forth a timeline for Grow Life's shipments under the contract:

> First shipment with 1 container, arrived in Kuwait on September 13, 2015.
>
> The second shipment, with 2 containers, arrived on October 2. 2015.
>
> The third shipment, with 3 containers, arrived on October 9, 2015.
>
> The fourth shipment, with 5 containers, arrived on October 27, 2015.

(Supp. R4, tab 74)

82. On November 15, 2015, Grow Life's representative, Mr. Kevin Smith, emailed the CO: "I literally have 2,200 beds, 1,370 mattresses, and 1,230 wall lockers sitting 62 miles from Buehring and Arifjan" (R4, tab 19). Those quantities, however, were still 95 beds, 3,575 mattresses, and 1,870 wall lockers short of the contract requirements. The remaining items had not yet been shipped to Kuwait from Grow Life's warehouse in Dubai (tr. 2/134).

16

83. The same day, November 15, 2015, the CO issued a final decision (COFD) partially terminating the contract for cause (R4, tab 20). The COFD stated that time was of the essence for this contract, and appellant failed to deliver by September 5, 2015, as required by the contract. Further, it stated that Grow Life failed to provide proper documentation for badging and customs clearance as required by the October 26, 2015, cure notice. The termination included an effective date of November 3, 2015, the date the CO held a telephone call with Grow Life and discussed the issue of partial termination. The termination was emailed to Mr. Smith, who confirmed receipt the following day, on November 16, 2015 (R4, tab 21).

F. Appellant's Claim and Board Proceedings

84. On December 23, 2015, appellant submitted a certified claim to the CO challenging the partial termination for cause and seeking $1,180,563.72 in damages relating to the termination (R4, tabs 27-28).

85. On January 4, 2016, Grow Life filed a notice of appeal. The appeal challenged the partial termination for cause and sought monetary damages in the amount of $1,180,563.72. Grow Life subsequently filed a complaint, dated January 29, 2016, to dispute the partial termination for cause and in support of its monetary claim of $1,180,563.72. The Board docketed the appeal as ASBCA No. 60398.

86. On February 8, 2016, the Board wrote to Grow Life, explaining that only the propriety of the termination for cause is before the Board as ASBCA No. 60398, and giving Grow Life until February 28, 2016, to explain why the Board possessed jurisdiction over the separate monetary claim.

87. On February 22, 2016, Grow Life responded to the Board's letter and explained that it intended to pursue an appeal involving the $1,180,563.72 claim, in addition to its appeal from the partial termination for cause. Grow Life further explained that it had not received a response from the government to its December 23, 2015, monetary claim.

88. On February 26, 2016, the Board wrote to Grow Life, stating that the Board understood Grow Life intended to pursue an appeal from the deemed denial of Grow Life's December 23, 2015 monetary claim, in addition to its appeal from the partial termination for cause. The Board docketed the monetary claim as ASBCA No. 60467.

89. On May 9, 2016, the Board informed appellant that claims over $100,000.00 must be certified when submitted to the CO in accordance with the Contract Disputes Act (CDA) of 1978, 41 U.S.C. §§ 7101-7109, and that the Board could not locate the certification in the record. On May 12, 2016, appellant sent the Board a copy of the certification of claim, which appellant had furnished to the CO on December 23, 2015.

17

90. On July 13, 2016, the Board held a conference call with the parties, during which the government agreed to provide appellant's monetary claim and certification of claim (supp. R4, tabs 27-28) to the CO for review and issuance of a final decision.

91. On September 1, 2016, the CO issued a final decision denying appellant's monetary claim (supp. R4, tab 30).

92. On September 5, 2016, appellant appealed the CO's final decision, and the Board docketed appellant's monetary appeal as ASBCA No. 60778, which was consolidated with ASBCA Nos. 60398 and 60467.

93. On April 13, 2017, appellant sent a letter to the Board requesting to increase its monetary claim from $1,180,563.72 to $2,746,068.64.

94. On April 14, 2017, the government objected to appellant's request, contending that appellant's request was not an appeal from a CO's final decision. The government requested that the Board deny appellant's request to increase its claim or file an amended complaint explaining the basis of the additional amount (Bd. corr. ltr. dtd. April 26, 2017 at 2).

95. On May 23, 2017, the parties held a teleconference with the Board. On May 25, 2017, the Board issued a scheduling order setting June 5, 2017, as the deadline for "[a]ppellant to file an amended complaint setting forth alleged facts supporting entitlement to any additional damages."

96. On June 5, 2017, appellant filed an amended complaint seeking to increase its monetary claim from $1,180,563.72 to $3,569,471.27 (amended compl. ¶ 6).

DECISION

I. ASBCA No. 60398 - Whether Partial Termination for Cause was Justified

A. Standard of Review for Termination for Cause

[A] default termination is a drastic sanction which should be imposed (or sustained) only for good grounds and on solid evidence." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987) (quoting *J.D. Hedin Constr. Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969)). Though this is an appeal brought by Grow Life, because a termination for default is essentially a government claim, the government bears the burden of proving, "by a preponderance of the evidence, that a termination for default was justified." *DayDanyon Corp.*, ASBCA No. 57681, 15-1 BCA ¶ 36,073 at 176,151; *Keystone Capital Services*, ASBCA No. 56565, 09-1 BCA ¶ 34,130 at 168,753 (citing *Lisbon Contractors*, 828 F.2d at 765). If the government establishes a prima facie case of the contractor's default, then the contractor bears the burden to show that its default was

18

excusable or caused by the government's material breach. *Military Aircraft Parts*, ASBCA No. 59978, 15-1 BCA ¶ 36,101 at 176,256. These FAR Part 49 principles apply equally in the case of a termination for cause under FAR 52.212-4(m). *Genome Communications*, ASBCA No. 57267, 11-1 BCA ¶ 34,699 at 170,899 (citing *General Injectables & Vaccines, Inc.*, ASBCA No. 54930, 06-2 BCA ¶ 33,401 at 165,593, *aff'd*, 519 F.3d 1360, *supplemented*, 527 F.3d 1375 (Fed. Cir. 2008)).

## B. Government has made a Prima Facie Showing of Default

We conclude that the government has made a prima facie case showing that Grow Life defaulted on the contract when it failed to provide adequate assurances that it would deliver and install the furniture by the November 28, 2015 deadline set forth in the cure notice.

### 1. The Cure Notice Modified the Contractual Deadline

Pursuant to FAR 12.403(c)(1), the government was not required to send a cure notice prior to terminating the contract for late delivery. However, by sending a cure notice and establishing a new deadline for delivery, the government waived its right to enforce the original September 5, 2015 deadline. *Thunderstruck Signs*, ASBCA No. 61027, 17-1 BCA ¶ 36,835 at 179,505; *see also Yankee Telecommunication Laboratories, Inc.*, ASBCA No. 25250 *et al.*, 85-1 BCA ¶ 17,786 at 88,876 (upholding default termination based on failure to meet new delivery date after government waived earlier deadline). Thus, in this appeal, the cure notice established a new final deadline of November 28, 2015, for the delivery and installation of all the furniture.

### 2. Grow Life Failed to Provide Adequate Assurance that it Would Deliver and Install the Furniture by the Cure Notice Deadline

The contract incorporates FAR 52.212-4(m), which provides that the government may terminate the contract for cause if the contractor fails to provide adequate assurances of future performance upon request (finding 17).

A termination for default for failure to prosecute the work requires "a reasonable belief on the part of the contracting officer that there was 'no reasonable likelihood that the [contractor] could perform the entire contract effort within the time remaining for contract performance.'" *Lisbon Contractors*, 828 F.2d at 765 (quoting *RFI Shield–Rooms*, ASBCA Nos. 17374, 17991, 77–2 BCA ¶ 12,714 at 61,735). A termination for failure to make progress usually occurs where the contractor has fallen so far behind schedule that timely completion has become unlikely. *Hannon Elec. Co. v. United States*, 31 Fed. Cl. 135, 143 (1994), *aff'd*, 52 F.3d 343 (Fed. Cir. 1995) (table). Indeed, the government is not required to prove that it was impossible for the contractor to complete performance on time, but instead that "a demonstrated lack of diligence

19

indicates that [the government] could not be assured of timely completion." *Lisbon Contractors*, 828 F.2d at 765.

By the end of November, appellant had shipped most of the furniture to Kuwait (finding 51). However, appellant had delivered and installed only 480 metal bed frames and had failed to obtain customs clearance for the remaining shipments. Moreover, Grow Life had not obtained base access badges for its employees or contractors and, therefore, was not in a position to deliver and install any of the furniture that had arrived in Kuwait.

As we discuss further below, the evidence demonstrates that, as of the date of termination on November 15, 2015, Grow Life would not have completed delivery and installation of the furniture by the extended deadline of November 28, 2015. Therefore, we conclude that the Army has made a prima facie showing of default.

## C. Whether Grow Life's Default was Excusable

Having concluded that the government has made a prima facie showing of default, we next address whether Grow Life has demonstrated that its default was "caused by an occurrence beyond the reasonable control of the contractor and without its fault or negligence" or by acts of the government. FAR 52.212-4(f); *Gargoyles, Inc.* ASBCA No. 57515, 13 BCA ¶ 35,330 at 173,413.

Grow Life advances several theories to explain why its default was beyond its control. First, it argues that the government's unilateral modification of the bed frame order delayed shipments of the bed frames and further delayed the delivery schedule (app. br. at 4-5). Next, Grow Life contends that the government failed to cooperate with Grow Life's efforts to obtain base access for its employees and contractors (*id.* at 9-12). Finally, Grow Life blames the government for its difficulties with obtaining customs approval, contending that the government failed to cooperate and that it had the necessary paperwork in hand prior to the cure notice deadline (*id.* at 12-14).

We address each of these contentions below.

## 1. Modification of Bed Frame Order

Appellant contends that the government's unilateral modification of the bed frame order delayed shipments of the bed frames (app. br. at 3-4).

This contention is irrelevant in light of our conclusion that the contractual deadline for installation and delivery of the furniture was extended to November 28, 2015. Because most of the furniture, including the bed frames, were shipped to either Dubai or Kuwait by November 15, 2015 (finding 51), any delay relating to the *shipment* of the bed frames should not have affected Grow Life's ability to deliver and install the furniture at the contractual destination by November 28, 2015.

20

## 2. Difficulties with Customs Approvals

Grow Life next argues that the government failed to assist Grow Life with obtaining customs clearance. In particular, Grow Life contends that CPT Winterfeldt was in possession of the necessary customs paperwork, but failed to provide the signed documents to Grow Life in sufficient time to complete delivery and installation within the deadline (app. br. at 15).

The contract expressly places on the contractor the duty to obtain customs clearance for its shipments. The contract states:

> The Contractor shall be responsible for all customs clearance actions. All necessary arrangements, clearance procedures, and coordination with the Host Government customs, will be the *sole* responsibility of the Contractor.

The contract also sets forth the address and location of the government office responsible for reviewing and signing customs documentation, as well as a list of the specific documents that the contractor is to supply to the CO in order to obtain a government signature on the customs documents. Finally, the contract sets forth precisely the steps for processing incoming shipments, including the use of an AK 302 form prepared by the courier, obtaining the customer's signature (in this case, the CO or her delegate), and submission of the form to Kuwaiti General Administration of Customs (KGAC). (Finding 19)

The hearing testimony further confirmed that Grow Life was to submit original documents – specifically Form AK 302 – to the CO for government signature and then Grow Life was responsible for submitting the original signed documents to Kuwaiti customs for approval (finding 20).

At the hearing, Mr. Rahmatzai admitted that he had no prior personal experience with obtaining customs clearance for shipments into Kuwait. Although he claimed to have an associate, Mr. Krishna Kumar, responsible for handling logistics, Mr. Kumar was located in Dubai, not Kuwait, and did not personally assist with obtaining customs approvals. (Finding 54) Instead, Grow Life relied on Elisha Almeida, with Frontline Logistics, as Grow Life's agent to shepherd its shipments through the Kuwaiti customs approval process (finding 3). The record is not clear, nor did Grow Life explain, the business relationship, if any, between Grow Life, Frontline Logistics, Mr. Kumar, and Ms. Almeida.

The record demonstrates that Grow Life's decision to delegate the responsibility for obtaining customs approvals created confusion and ultimately failed to obtain the necessary customs approval for its shipments.

21

There was considerable back-and-forth between Ms. Almeida, Mr. Rahmatzai, and government representatives, including CPT Winterfeldt, regarding the customs paperwork. Grow Life contends that the government, and CPT Winterfeldt in particular, held up the paperwork and prevented Grow Life's agents from obtaining the necessary customs approvals.

For example, Grow Life contends that CPT Winterfeldt wrongfully delayed the September 15, 2015 shipment containing wall lockers, because the bill of lading described the shipment as containing file cabinets (tr. 2/101-04). Grow Life additionally contends that it sent a picture of the wall lockers to the government and that CPT Winterfeldt falsely denied having received the pictures (app. br. at 12-13). When Grow Life attempted to correct the description on the bill of lading by typing over and replacing the description, CPT Winterfeldt insisted on having new original documents produced (finding 45). We find CPT Winterfeldt's insistence on having original documentation reasonable, as well as her insistence that Grow Life comply with the terms of the contract by bringing all of the necessary customs paperwork to the appropriate government office for signature, and then taking the signed paperwork to Kuwaiti customs for approval. Her insistence also is consistent with the express language of the contract, which places the sole duty of obtaining customs approval on the contractor.

Grow Life also contends that the government refused to issue a "tax exempt letter" to Grow Life. According to Grow Life, this letter would have exempted the furniture from customs duties and obviated the need for customs paperwork. (App. br. at 12, 21)*

During the hearing, Mr. Rahmatzai referred to this exemption letter as DA Form 1687 (*see* tr. 1/62, 2/28-29). On its face, DA Form 1687 is an internal Army document for delegating signature authority from the CO or COR to other Army persons to request and sign customs documents (finding 57). It is not, as Grow Life contends, used to delegate authority to a contractor to submit customs documents under the contractor's own signature, nor is it used as a mechanism to avoid the contractual obligation to obtain a government signature on customs documents prior to submitting the documents to Kuwaiti

---

* In its post-hearing brief, Grow Life cited an example of a previous contract for the delivery of items to the Air Force in Afghanistan in which it obtained a letter exempting certain items from customs duties, and attached a copy of the letter (app. br., annex 1). We decline to consider this material, because it is not part of the record and was not properly introduced as evidence during the hearing. *See* Board Rule 13(b) (except as the Board may otherwise order, no evidence will be received after completion of an oral hearing); *Yamin*, ASBCA No. 35373, 90-2 BCA ¶ 22,657 at 113,836 (declining to consider new evidence after close of record that could have been introduced at any stage in the proceedings).

customs (tr. 1/63, 2/119). The government's alleged failure to issue a DA Form 1687 to Grow Life or its agents, therefore, had no bearing on Grow Life's ability to perform the contract.

In sum, we conclude that Grow Life's failure to obtain the necessary approval from Kuwaiti customs is not excused by the Army's decision not to issue DA Form 1687 or a tax exemption letter.

### 3. Difficulties with Employee Badging Process

Grow Life contends that the government failed to cooperate with Grow Life's efforts to obtain base access for its employees. In particular, appellant states that Mr. Rahmatzai asked CPT Winterfeldt, the COR, for assistance with the badging process, but she did not respond for more than two weeks (app. br. at 11).

The record indicates that Grow Life consistently misunderstood its obligations with respect to base access. For example, in August 2015, Mr. Rahmatzai stated that he did not think that Grow Life would need badges for its employees. He also suggested, wrongly, that his workers could simply obtain a "one time gate memo pass" in order to install the furniture. (Finding 59) Similarly, Grow Life's agent, Ms. Almeida, proposed using military escorts to bring laborers onto the base to install the furniture. Neither of these proposals was consistent with Grow Life's contractual obligation to provide laborers with base access to assemble and install the furniture. (Findings 18-19) Indeed, Grow Life acknowledges in its post-hearing brief that appellant was contractually obligated to get the badges for their labor (app. br. at 10).

Despite having the necessary information as early as September 6, 2015, it wasn't until September 30, 2015, that Grow Life submitted installation access applications for its workers (finding 63). The government rejected the applications, because the applicants lacked the requisite visas. Mr. Rahmatzai admitted that he did not have personal knowledge of the different types of Kuwaiti visas (finding 72), and Ms. Almeida stated that Grow Life currently did not have workers with the appropriate Kuwaiti visas (finding 65). We conclude that Grow Life failed to plan adequately for the need to employ individuals with base access (or who would have been eligible to obtain access) to install the furniture.

### 4. Voluntary Decision to Stop Shipments

At the hearing, Mr. Rahmatzai admitted that he stopped delivery of the subsequent shipping containers because he was having difficulty obtaining customs approval and base access (tr. 2/126). Grow Life's timeline for the shipment of each of its 11 containers demonstrates that the shipments were staggered across a period of time from September 13, 2015 through October 27, 2015 (finding 75). Moreover, Grow Life admitted at the hearing that it made a business decision to stagger the furniture shipments, rather than scheduling them to arrive on or near the same date (finding 76).

23

By voluntarily staggering its shipments, Grow Life undercuts its argument that the government was responsible for Grow Life's delay in performance. Accordingly, the delay was not excusable.

## II. ASBCA No. 60467 - Whether Government Breached its Implied Duty of Good Faith and Fair Dealing

Both parties to a contract are subject to the implied duty of good faith and fair dealing. This doctrine is based upon the notion that every contract "imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014)(quoting Restatement (Second) of Contracts § 205 (1981)); *see also Kelly-Ryan, Inc.*, ASBCA No. 57168, 18-1 BCA ¶ 36,944 at 180,030; *Relyant, LLC*, ASBCA No. 59809, 18-1 BCA ¶ 37,085 at 180,539. Pursuant to this implicit duty, each party's obligations "include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Metcalf*, 742 F.3d at 991 (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

Grow Life's post-hearing brief does not address its allegations set forth in ASBCA No. 60467 that the government violated its duty of good faith and fair dealing. However, Grow Life raises specific contentions about the government's cooperation regarding base access and customs processing that, if true, may constitute a breach of the government's implied duty of good faith and fair dealing.

First, Grow Life contends that the government delayed providing information about how to obtain access badges and initially provided incorrect information about the badging process (app. br. at 12). Second, Grow Life argues that the government improperly withheld necessary signatures on the customs documentation Grow Life submitted, thereby delaying acceptance of its shipments into Kuwait *(id.* at 12-14). Grow Life also maintains that the government failed to cooperate by refusing to sign a blanket tax-exemption letter for the entry of the shipments into Kuwait *(id.* at 14).

After examining the communication between the parties, we see no evidence that the government specifically intended to prevent Grow Life from performing its contractual duties.

The contract required cooperation between the parties to secure base access (badging) for the contractor's employees. The contract provided instructions about the location and phone number for the badging office, and expressly warned the contractor that badging for residents of certain countries is restricted or unavailable and that the contractor must contact the badging office in order to obtain a waiver of such restrictions. (Finding 18)

On August 22, 2015, Grow Life first reached out to the COR, CPT Winterfeldt, for information about the badging procedure. CPT Winterfeldt responded that Grow Life should

"go through the proper channels, because I do not do anything with security or badging."
(Finding 58) Ultimately, however, on September 6, 2015, the government provided the
necessary information to Grow Life via email (finding 61). However, it was not until
October 2, 2015, that Grow Life participated in an extensive dialogue with SFC Segrain
regarding the requirements and paperwork necessary for base access (findings 64-68).

CPT Winterfeldt's initial response to Grow Life's inquiry was not terribly helpful
and could be construed as inconsistent with the contractual requirement of "coordination"
with the CO or COR. However, we find that any delay in obtaining information about base
access is nullified by the government's extension of the original September 5, 2015
performance deadline. As we previously held, the government's cure notice extended
Grow Life's performance deadline to November 28, 2015. With the extended performance
deadline, Grow Life had ample time to hire workers with the appropriate Kuwaiti visas
who would have been capable of obtaining approval to access Camp Arifjan or
Camp Buehring.

The parties' correspondence regarding obtaining customs approval for the
incoming shipments also shows frustration on the part of the government, but that
frustration falls well short of bad faith. CPT Winterfeldt made every effort to assist Grow
Life with obtaining approval from Kuwaiti customs, including hand delivering Grow
Life's paperwork to the Kuwaiti customs office. (Finding 46)

At the hearing, Grow Life failed to identify any specific duty that CPT Winterfeldt
failed to meet with respect to customs approval (finding 20). Instead, Grow Life fell
back on its misplaced insistence that the government should have issued a so-called "tax
exempt letter" to obtain blanket approval from Kuwaiti customs for the entry of Grow
Life's shipments (tr. 2/139-41). As we explained above, the "letter" to which Grow Life
refers is an internal Army document for delegating signature authority to sign customs
documents, not a document for exempting a contractor from Kuwaiti customs
requirements (finding 57).

In sum, the evidence demonstrates that the government did not breach its implied
duty of good faith and fair dealing. Moreover, the evidence demonstrates that, as of
termination for default on November 15, 2015, Grow Life would not have delivered and
installed the furniture by the extended deadline of November 28, 2015.

III. ASBCA No. 60778 – Whether Grow Life is Entitled to Delay Damages

In cases involving delivery schedules, such as this appeal, we repeatedly have held
that the "action of the parties in agreeing upon a new delivery schedule eliminates from
consideration the causes of delay occurring prior to such agreement." *Thunderstruck*,
17-1 BCA ¶ 36,835 at 179,505 (quoting *Precision Dynamics, Inc.*, ASBCA
No. 42955, 97-1 BCA ¶ 28,846 at 143,892); *see also Bulova* Technologies *Ordnance Systems
LLC*, ASBCA No. 57406, 14-1 BCA ¶ 35,521 at 174,097 (in agreeing to a new delivery

schedule, the contractor erases the ability to raise pre-existing causes of delay). In this appeal, the government's decision to extend the period of performance until November 28, 2015, eliminated from consideration any delays occurring prior to that date.

Moreover, because we have concluded that the government's partial termination for default was justified, and that Grow Life would not have completed performance by the November 28, 2015 deadline, Grow Life is not entitled to delay damages.

## CONCLUSION

The appeals are denied.

Dated: June 3, 2019

KENNETH D. WOODROW
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

JOHN J. THRASHER
Administrative Judge
Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 60398, 60467, 60778, Appeals of Grow Life General Trading, LLC, rendered in conformance with the Board's Charter.

Dated:

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals