ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Incircle Management, Inc. | )  ASBCA No. 62684 |
| | ) |
| Under Contract No. W912BV-20-P-0059 | ) |

APPEARANCE FOR THE APPELLANT:          Mr. HB Jung
                                                                            President

APPEARANCES FOR THE GOVERNMENT:     Michael P. Goodman, Esq.
                                                                             Engineer Chief Trial Attorney
                                                                          Stephanie J. Milburn, Esq.
                                                                             Engineer Trial Attorney
                                                                             U.S. Army Engineer District, Tulsa

OPINION BY ADMINISTRATIVE JUDGE EYESTER
PURSUANT TO BOARD RULE 11

Incircle Management Inc. (Incircle) appeals the termination for cause by the U.S. Army Corps of Engineers (USACE or government) of its purchase order for the cleaning of park facilities. According to the government, Incircle failed to provide numerous, required cleaning services at Canton Lake, Oklahoma. The Board has jurisdiction over the termination pursuant to the Contract Disputes Act, 41 U.S.C. § 7101.

The parties elected to waive a hearing and submit the appeal on the record pursuant to Board Rule 11. Because the government has established the validity of the default termination, and Incircle has failed to demonstrate the default was excusable, the appeal is denied.

FINDINGS OF FACT

1. The government issued request for quotations (RFQ) No. W912BV-20-Q-0046 on February 19, 2020, for spring and summer cleaning services at Canton Lake, Oklahoma (R4, tab 4A at 1, 6-7). According to the bid schedule, the services were Schedule I, Appendix A – Cleaning (*id.* at 7).

2. Appendix A was part of the RFQ's statement of work (SOW), which also included a general section, exhibits and attachments (R4, tab 4H at 2).[1] According to the

_____

[1] The Board issued an order requiring the agency provide a complete copy of the solicitation, including all attachments.

SOW, the purchase order's general purpose was the "cleaning of park facilities such as toilets, picnic/camping sites, and grounds keeping" (*id.* at 4). More specifically, per the performance requirements, the contractor was to clean all waterborne toilets, vault toilets, showers, change houses, picnic shelter, camping sites, and perform grounds keeping and refuse collection (*id.* at 20-21). Appendix A provided further detail and defined the term "clean" to require the contractor "sweep, wash, wipe, or brush facilities to ensure that dirt, dust, rocks, debris (tree limbs, rocks, driftwood, etc.), trash, garbage, ashes, fecal matter, urine, soap scum, biological formations and resultant stains, dead insects, insect nests . . . insect webs, bird droppings, and residue from cleaning agents are removed" (*id.* at 35).

3. In addition, per Appendix A, the contractor was required to empty refuse containers; distribute toilet tissue after cleaning the bathroom; remove litter and debris in a five-foot area around the facilities; remove vandalism and graffiti; replace burned out or broken lights; perform second cleanings on weekends and holidays; clean picnic shelter floor slabs, table seats and tops; remove all material from fireplaces; and clean all table shelters, cookers, and fire rings (R4, tab 4H at 31-33). The contractor was to clear refuse and debris visible from a distance of 25 feet from public use areas (PUAs),[2] access roads, fishing areas, embankment roads and the Amphitheater in an area bounded by an imaginary line 20 feet outside the limits of mowing (*id.* at 20, 33). The contractor was to pick up highly visible items beyond the area of mowing, including at the embankment road (*id.* at 33-34). The purchase order included an inventory list of toilets, showers, picnic and camping shelters, change houses, grounds/trails, refuse cans, etc., to be cleaned (*id.* at 38).

4. In addition, the contractor was to provide the necessary personnel within the specified time limits, provide an on-site supervisor and safety plan, and transport and furnish equipment such as mops, cleaning compounds and disinfectants (R4, tab 4H at 5, 7-8, 31). Per Appendix A, the contractor was to begin work by 7 a.m. and complete work by 3 p.m.; however, toilets requiring second cleanings needed the first cleaning by 11 a.m. and the second cleaning between 3 p.m. and 6 p.m. (*id.* at 31).

5. Services would be considered deficient if they failed to meet these performance requirements (R4, tab 4H at 4). The contracting officer's representative (COR) would determine whether services were deficient during the quality assurance inspections and "[t]he results of inspections" would not be "changed as a result of satisfactory re-performance" (*id.* at 7).

6. In response to the RFQ, Incircle submitted a seven-page quotation, most of which consisted of the pricing on the bid schedule stating the services were Schedule I,

---

[2] A PUA included the "[p]arks, as well as overlooks, nature and hiking trails, access points, and other areas used by the public for recreation" (R4, tab 4H at 4).

Appendix A – Cleaning, (R4, tab 4B). In its quotation, Incircle stated it would implement a work schedule and inspection plan for accuracy, consistency and timeliness of the requirements during weekdays, weekends, and holidays (*id.* at 2). We find that Incircle submitted its quotation based on the cleaning requirements set forth in the SOW, including Appendix A.

7. On March 29, 2020, USACE issued fixed-priced purchase order No. W912BV-20-P-0059 to Incircle in the amount of $58,295.60, with a one-year period of performance starting March 1, 2020, and four one-year option periods (R4, tab 4C at 1, 3). The purchase order did not contain any statement of work (*see id.*). The purchase order, however, did set forth the following contract line item numbers (CLINs): CLIN 0001 for the initial cleaning of showers and toilets prior to the opening season; CLINs 0002-0004, CLINs 0006-0007, and CLINs 0009-0010 for the cleaning of the PUAs at Big Bend, Canadian, Blaine, Fairview, Longdale, Riverside, and Sandy Cove parks, respectively; and CLIN 0005, CLIN 0008, and CLINs 0011-0012 for the cleaning at the Dam Embankment, the Overlook, Thunder Hill Road, and Amphitheater, respectively (*id.* at 3-8). We find that, at a minimum, the purchase order required Incircle perform initial cleaning of showers and toilets, and cleaning of the PUAs at the parks and other specified areas.

8. The purchase order incorporated by reference Federal Acquisition Regulation (FAR) clause 52.246-4, INSPECTION OF SERVICES – FIXED PRICE (AUG 1996) and explained that the services were to be inspected by the government at the destination (R4, tab 4C at 34). The purchase order also incorporated by reference FAR 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS (OCT 2018), which states in pertinent part:

> (m) Termination for cause. The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance.

(*Id.* at 54).

9. Incircle met with the COR on April 6, 2020, to discuss the cleaning requirements (*see* R4, tab 5A at 76-79; tab 5B at 1). At that time, the public restrooms at the parks were closed and therefore cleanings were not taking place as regularly scheduled, although they still needed some cleaning, including an initial cleaning (R4, tab 5B at 1, 7). On that same day, the COR sent a "second" cleaning schedule for use when the restrooms reopened to the public and additional cleanings were needed (*id.* at 1). The "second" cleaning schedule stated that second cleanings were to be performed between 3:00 p.m. and 6:00 p.m., and that "[a]ll restrooms, waterborne and vault toilets,

3

are to be cleaned using the same contract specifications as original cleanings." According to the schedule, there would be 47 second cleanings; 43 conducted on Saturday and Sunday from April 13-September 7, and four on specific holidays. (*Id.* at 3)

10. On April 8, 2020, the COR emailed Incircle and stated that a trash can at Big Bend by the Romtec bathroom had no liner but contained trash, and that the schedule in the statement of work was in effect except for the bathrooms as they were still closed. The COR explained that spot cleaning the bathrooms to remove bugs was still necessary. (R4, tab 5B at 7) Incircle responded: "Got it. I will make sure we provide the services as you expected" (*id.* at 8). On April 13, 2020, the COR notified Incircle via email of the following issues identified during the inspection: there was still trash in the can at Big Bend by the Romtec bathroom but no liner; there was trash in the Canadian Park areas A and B; the bathrooms at the Overlook needed an initial cleaning; there was trash along the roads at Blaine, Sandy Cove, and Riverside parks; there was trash by the group shelter at Longdale Park; the bathrooms at Fairview Park needed an initial cleaning; and the fire rings and campsite grills needed cleaning (*id.* at 11).

11. Although the purchase order did not include a SOW, on April 17, 2020, Incircle provided its accident prevention plan for cleaning services; the SOW attached to the RFQ had required such a plan (R4, tab 5B at 17). The plan's description of work included "cleaning toilets, showers, change houses, grounds, restrooms, picnic and camping sites, fishing areas, courtesy docks, dump stations, bulletin boards, embankment road, amphitheater, refuse collection and report[ing] stinging insects and nests" (*id.* at 18). We find, based on Incircle's meeting with the COR, subsequent emails on work to be performed, and its accident prevention plan, that Incircle understood the purchase order's requirements for cleaning services was based on the SOW which was included in the RFQ but not in the purchase order.

12. On April 20, 2020, the COR asked Incircle to "clean all picnic and camp sites with how the Scope of Work has it." Further, the COR explained that all the fire rings and grills at the camp sites needed to be cleaned out from burned wood and ash build-up and the Amphitheater needed cleaning of debris. In response, Incircle stated "Got it. We will clean them this week." (R4, tab 5B at 25-26)

13. On April 26, 2020, Incircle sent the COR three quality control reports stating that all items/tasks had been inspected at the various parks for April 5-25, 2020 (R4, tab 5B at 28-31). According to Incircle's quality control reports, the fire rings, cookers, tables, insects, etc. had been inspected at the picnic/camping areas, screened shelters, and group shelters. The quality control reports stated that the floors, sinks, toilets, showers and presence of insects, etc. had all been inspected at the restrooms. Finally, the reports stated that all trash cans, park roads and grounds, etc. had been inspected. (*Id.* at 29-31)

4

14. The COR emailed Incircle on April 27, 2020 and thanked them for cleaning out the Amphitheater. However, the COR also expressed concern regarding Incircle's quality control reports. In this regard, the COR explained that while Incircle's reports showed the fire rings, cookers and tables had been inspected, the COR noticed during his inspection that the majority of fire rings, cookers and some tables in the group shelters were not cleaned per the specifications. Further, the COR noted burned out light bulbs in certain shelters, uncleaned large grills at the shelters, trash along the highways, and trash around the Sandy Cove shelter, among other things. The COR believed Incircle was not performing work in the required timeframe of 7 a.m. to 3 p.m. as he had only noticed and heard from others that Incircle was cleaning in the mornings. (R4, tab 5B at 33) In response, Incircle stated it would hire another individual so there would be two employees starting in May and that it would "cover fully starting May" (*id.* at 35).

15. On April 28, 2020, the COR requested and Incircle provided a park cleaning schedule (R4, tab 5B at 40, 43, 45). The work schedule showed, for example, that toilets would be cleaned and trash would be emptied every day at the parks and Overlook between the hours of 7 a.m. and 3 p.m. (*id.* at 45). We find that Incircle understood that cleaning was required every day at the parks, as set forth in the RFQ's SOW and specifications.

16. The parks at Canton Lake reopened on May 20, 2020 (R4, tab 5C at 33). Similar issues with failure to remove trash and clean shelters and bathrooms arose both before and after the parks' reopening. While Incircle's quality control reports showed all items/areas inspected, the COR's inspections showed deficiencies. For example, on May 4, 2020, the COR's inspection, which was provided to Incircle, stated the grills at Sandy Cove contained partially burned material, there was trash around the shelter, the Longdale shelter had not been cleaned, and the men's bathroom at Sandy Cove was not cleaned that day (*id.* at 4-5). The COR called Incircle's supervisor about the Longdale shelter, who stated he believed another individual "would take care of it on Sunday because [the supervisor] noticed people using it on Saturday" (*id.* at 5). The COR's inspection on that day and the next noted that there were many spider webs and insects along the walls, light fixtures and windows at the bathrooms (*id.* at 5, 11).

17. On May 6, 2020, the COR notified Incircle that two trash cans at the cemetery had not been collected for some time as the trash bags were melting from the heat (R4, tab 5C at 16). In response, Incircle stated that the purchase order did not require cleaning those two trash cans. The COR responded by stating that Table A-3, Facilities Inventory for Cleaning Services Summer Period set forth an inventory of seven trash cans for the Canadian Park, including one at the cemetery. The COR further stated that there were currently two trash cans at the cemetery, but he was "taking 1 can out . . . to make the inventory count on the contract current." (*Id.* at 21) Incircle also asked whether the three trash cans at the Amphitheater were part of the Canadian Park inventory, and the COR explained they were not initially. However, the COR informed Incircle he was removing the requirement to empty three other trash cans so the Amphitheater cans would be part

of the total seven trash cans to be emptied. The COR also stated that he would complete a new count to make sure the inventory list was current and if there were changes, they could work it out. (*Id.* at 23) The COR also removed two extra trash cans from Blaine Park and two from the fish jetties so that the total trash cans to be emptied matched the inventory list on the statement of work (*id.* at 26, 29). We find the COR required Incircle empty only the number of trash cans set forth in the RFQ's inventory and that even if the COR had previously required Incircle to empty additional trash cans, the record shows Incircle was deficient in performing most if not all of those services.

18. On May 21, 2020, Incircle submitted an updated work schedule and notified the COR it had two onsite representatives, and that one representative would be at the various parks each day of the week (R4, tab 5C at 41). The work schedule showed that Incircle would clean the toilets and empty the trash every day at each of the parks (*id.* at 42). Incircle continued to submit quality control reports for May 2020 showing all areas had been inspected (*see id.* at 47, 54, 56). On May 26, 2020, the COR notified Incircle that Park Rangers had emailed pictures of bathrooms during Memorial Day weekend, which showed unreplenished toilet paper rolls and trash in the cans (*id.* at 48, 50-52). Further, the COR informed Incircle that none of the Big Bend camp sites had been cleaned, including the fire rings and grills (*id.* at 48).

19. On June 1, 2020, the COR emailed Incircle and stated that the grounds keeping at Thunder Road was deficient, small trash was piling up at the camp sites and shelters, there was purple goo on the tables at Sandy Cove, and there were customer complaints about the bathrooms due to spider webs and dead insects. The COR specifically told Incircle he did not want "any dead insects, spider webs, dirt, fecal matter on the toilets . . . ." (R4, tab 5D at 4) The COR attached pictures showing all of these issues (*id.* at 5-13, 16-19). Incircle picked up the trash along Thunder Road (*id.* at 20). The COR performed a campsite clean-up and bathroom inspection on June 2 at Big Bend Park and found no worker on site and that no park cleaning had occurred for an uncertain amount of time (R4, tab 6B at 6).

20. On June 11, 2020, the COR informed Incircle that there were stains in the toilets at Big Bend, Canadian, and Sandy Cove parks, and the Overlook, and there were urine and other stains around the toilets at Canadian Park (R4, tab 5D at 44, 46). The COR attached numerous pictures of uncleaned and stained toilets (with what appears to be urine and fecal matter) and floors stained with urine and other material, which were taken during the quality control inspection (*id.* at 48-63). The COR also attached pictures showing spider webs at the various windows and a burned out light (*id.* at 64-67). We find that despite the fact Incircle informed the government it would clean the parks every day, especially the bathrooms, it failed to do so.

21. The COR reinspected areas noted as issues for grounds keeping and noticed several missed areas, which he documented with pictures (e.g., discarded fishing pole)

6

(R4, tab 5D at 68-70, 72-74). There was also graffiti on the tables and seat at the Longdale Park (*id.* at 71). A June 17, 2020 deficiency report noted trash at multiple campsites and broken glass at one of the sites (*id.* at 81). More deficiencies were noted in the June 22, 2020 quality assurance reports, which included pictures of trash (e.g., beer and soda cans, water bottles) (*id.* at 87-125).

22. On June 25, 2020, the government issued unilateral, no-cost Modification No. P00001, which incorporated the statement of work from Section C of the solicitation, as well as SWT Form 982 (Quality Assurance Report), SWT Form 990 (Quality Control Inspection Log), the Job Hazard Analysis, Work Schedule for Park Cleaning, and the Canton Lake map (R4, tab 4D at 1; *see also* R4, tab 4H). The next day, the government issued a cure notice stating that Incircle failed to provide: experienced and skilled personnel that worked the required hours; an on-site supervisor that could be reached between the required hours; all required cleaning services (bathroom cleaning, removal of trash from campsites, campsite cleaning, weekend cleaning, and re-work of deficient areas); and adequate quality control inspections (R4, tab 5D at 177-78). The notice warned the government could terminate the purchase order for cause and provided Incircle 10 days to improve its performance (*id.* at 178).

23. On June 29, 2020, the COR issued another quality assurance report stating the Canadian Park bathrooms were not cleaned, there was fecal matter on the toilets, the floors were stained, and trash cans were unemptied. Further, there were water rings on the toilets, dead insects and webs on the walls, and stains on the shower floors. (R4, tab 5D at 182-83) The COR noted similar issues with the bathrooms at Big Bend Park, Sandy Cove Park, and the Overlook. There were also issues with uncleaned fire rings and grills at Big Bend Park, as well as trash and refuse at the Longdale, Blaine, Big Bend, and Canadian parks. (*Id.* at 183) The COR attached pictures showing overfilled trash cans at Longdale Park, trash in the fire rings, uncleaned grills, numerous dead insects in the bathrooms, stained floors, and uncleaned and stained toilets (*id.* at 185-221, 222-26). The COR wrote to Incircle on one of the pictures that there was fecal matter, other biological formations, and water rings on the toilets because they were not getting cleaned daily and therefore, they were below standards (*id.* at 221).

24. In response to the cure notice, on July 2, 2020, Incircle stated it provided the personnel necessary to perform, the employees performing the cleaning were also the on-site supervisors, and it provided quality control reports and work schedules. Incircle further stated that while "[t]here were deficiencies of service, [] we didn't fail to clean. We provided re-perform[ance] and completed the service." (R4, tab 5E at 6) Further, Incircle explained that it performed work outside the required hours because the government required it to perform "non-contract" work such as: cleaning nine additional refuse containers every day for which the government did not pay Incircle; grounds keeping of additional non-PUAs; and removal of refuse and debris outside the requirements of the purchase order (*id.* at 7-8).

7

25. More issues arose in July 2020. Incircle was keeping its supplies in chase ways at the Big Bend and Canadian parks after it was told it could not. Some supplies blocked the maintenance hallways, and other supplies, such as lights, were found sitting on the plumbing in the bathrooms. (R4, tab 5E at 17-19) Without going into too much detail, the bathrooms, and especially the toilets, were still not getting cleaned at the Big Bend, Canadian and Sandy Cove parks (*id.* at 23-24). In addition, Incircle failed to provide timely work schedules or changed schedules last minute (*id.* at 28).

26. According to other July COR reports, Incircle employees stated they were not provided with proper equipment, and one stated the mop he was using to clean the floors was falling apart (R4, tab 6C at 5). In late July, some of the bathroom issues seemed to have been remedied, but others remained; and there was highly visible trash at the Amphitheater, Longdale Park, and Thunder Road (R4, tab 5E at 31). On July 25, 2020, Incircle provided a new work schedule, again showing the bathrooms would be cleaned every day at the parks (*id.* at 39-40).

27. On July 27, 2020, the COR notified Incircle that the same trash he documented at the parks from the prior week was still highly visible; bathrooms were not cleaned per the specifications; an Incircle employee stated the cleaning agent Incircle provided was ineffective in removing water stains; the shower floors at Canadian Park were not cleaned or mopped; three lights were burned out at the Canadian Park bathrooms; and Incircle workers were not using step ladders to replace lights but caught standing on a plastic bucket or metal trash can, which presented a safety hazard (R4, tab 5E at 42-43). We find that Incircle failed to clean the parks in accordance with the terms of the purchase order, as modified.

28. On August 6, 2020, the COR sent another quality report to Incircle again outlining all the deficiencies in the work, including dead insects, worsening water rings, unsterilized or uncleaned toilets, and trash at the various locations, including the shelters (R4, tab 5F at 4-6). On August 7, 2020, Incircle wrote the contracting officer disputing the COR's interpretation of highly visible refuse. According to Incircle, the COR wanted all trash removed, including little plastic items or cigarette butts that Incircle believed was not highly visible. Incircle requested clarification on the matter. (*Id.* at 7) In response, on August 13, 2020, the contracting officer explained that per the purchase order, the described items fell within the grounds keeping areas of the parks and should be picked up while the trash pick-up of highly visible items only applied to "the area bounded by an imaginary line 20 feet outside the limits of mowing" (*id.* at 13).

29. On August 14, 2020, the contracting officer prepared a memorandum outlining the bases for termination for cause of Incircle's purchase order (R4, tab 3). The memorandum explained that the COR had issued multiple quality assurance reports (including seven reports after issuance of the cure notice) documenting deficient work

and Incircle failed to acknowledge the majority of these reports or provide required reperformance (*id.* at 1).

30. That same day, the contracting officer terminated the purchase order for cause because Incircle failed to provide contractually required services (R4, tab 2). The modification terminating the purchase order reduced the total funded value from $58,295.60 to $37,386.59 (R4, tab 4E at 1). On September 11, 2020, Incircle appealed the termination decision to the contracting officer, who later informed Incircle he would not change his decision (R4, tab 5G at 1, 3). On September 18, 2020, Incircle filed its notice of appeal with the Board disputing the termination for cause.

DECISION

Pursuant to the relevant default clause, in this appeal FAR 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS (OCT 2018), the government may terminate a contract for cause "in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance." (Finding 8) We have explained before that the principles underlying terminations for default apply equally to terminations for cause issued pursuant to the commercial items FAR 52.212-4 clause. *Axxon Int'l, LLC*, ASBCA No. 61549, 20-1 BCA ¶ 37,564 at 182,393. A termination for default is a government claim. *Securiforce Int'l Am., LLC v. United States*, 879 F.3d 1354, 1363 (Fed. Cir. 2018). Therefore, the government bears the burden of proving that its termination was justified. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987); *Axxon*, 20-1 BCA ¶ 37,564 at 182,393.

The government terminated the purchase order because Incircle failed to provide contractually required services (R4, tab 2). Specifically, the contracting officer concluded the COR had issued multiple quality assurance reports documenting deficient work and Incircle failed to acknowledge the majority of these reports or provide required reperformance (R4, tab 3).

As noted, initially, the purchase order failed to include an SOW setting forth the specifications for cleaning at the parks. We found that the purchase order, however, required Incircle nonetheless still perform an initial cleaning of showers and toilets, and cleaning of the PUAs at the parks and other specified areas (finding 7). According to the Merriam-Webster online dictionary, "clean" means "free from dirt or pollution." *Merriam-Webster.com Dictionary*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/clean (last visited Aug. 10, 2023). Despite the order's language and the common definition of the term, we found that Incircle failed to clean several areas at the park (finding 20). FAR 52.212-4(m), permits the contracting officer to terminate the purchase for "any default" and we conclude that here, Incircle was in

9

default.  *See United Healthcare Partners, Inc.*, ASBCA No. 58123, 16-1 BCA ¶ 36,374 at 177,314.

Further, we found that based on Incircle's quotation, initial meeting with the COR, emails on work to be performed, and submission of its accident prevention plan, that Incircle understood the purchase order's requirements for cleaning services was based on the SOW included in the RFQ but not originally in the purchase order (findings 6, 11).  In addition, Incircle provided work schedules stating that it would clean toilets and empty trash every day at the parks and Overlook during the required timeframes and was failing to do so (findings 15, 20).  Despite this understanding, course of performance, and Incircle's commitment, Incircle was not performing cleaning services, including cleaning of the bathrooms.

Incircle itself noted in response to the cure notice that "[t]here were deficiencies of service," but claimed it provided re-performance and completed the services (R4, tab 5E at 6).  However, contrary to Incircle's assertions on reperformance, the record shows that bathrooms, trash cans, park shelters, etc. were uncleaned over the course of several months (findings 15, 20).

Incircle's performance issues continued after the government amended the purchase order to include the SOW.  In this regard, the record is replete with documentation, including pictures, of uncleaned bathrooms, toilets, trash cans, park shelters, fire rings, etc.  We found that Incircle failed to meet the terms of the purchase order (finding 27).  Accordingly, we conclude that Incircle failed to meet the definition of clean set forth in Appendix A, which required the contractor "sweep, wash, wipe, or brush facilities to ensure that dirt, dust, rocks, debris (tree limbs, rocks, driftwood, etc.), trash, garbage, ashes, fecal matter, urine, soap scum, biological formations and resultant stains, dead insects, insect nests . . . insect webs, bird droppings, and residue from cleaning agents are removed" (R4, tab 4D at 31).  In addition, Incircle failed to meet other requirements set forth in Appendix A, including emptying refuse containers; removing litter and debris; removing graffiti; replacing burned out lights; performing second cleanings on weekends and holidays; and cleaning shelters, cookers, and fire rings (*id.* at 28-29).  Incircle also failed to provide sufficient mops and cleaning compounds and meet the required hours of performance (*see id.* at 7).  Further, while Incircle claims it re-performed the work, the SOW explained that "[t]he results of inspections," such as deficiencies found, would not be "changed as a result of satisfactory re-performance" (R4, tab 4H at 7).  Incircle's work was deficient.

Incircle does not specifically dispute these facts or challenge USACE's assertion that it did not meet several of the purchase order's requirements such as the specifications for clean bathrooms.  We conclude the government has met its burden that the termination was justified.

10

The burden of proof now shifts to Incircle to prove that its default was excusable. In this regard, FAR 52.212-4(f) states that the contractor "shall be liable for default *unless* nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence. . . ." (Emphasis added).

Incircle contends that it was forced to clean nine additional trash cans and to grounds keep additional non-PUAs, and that it raised these issues to the COR who later admitted these services were not required by the purchase order (app. br. at 1-4). According to Incircle, this alleged breach and misconduct by the government tainted the termination (*id.* at 2). We have found, however, the COR required Incircle empty only the number of trash cans set forth in the SOW's inventory and that even if the COR had previously required Incircle to empty additional trash cans, the record shows Incircle mostly failed to perform those services (finding 17). Further, Incircle has not shown how emptying additional trash cans prevented it from cleaning other areas of the park over the course of several months.

With respect to the grounds keeping of non-PUAs, Incircle circled two areas on a map showing the project boundaries (app. br. at 3). Incircle states it was told to clean the E645 and N2466 roads it circled, which it states were outside the project boundaries (*id.* at 2-3). There is nothing in the record supporting Incircle's bare assertions. Rather, the record shows that Incircle failed to clean, by any definition of the term, the parks (and especially the bathrooms). Further, Incircle has not shown how this alleged extra work prevented it from cleaning other areas of the park over the course of several months.

Finally, Incircle argues that the cure notice was defective because it was issued just prior to the modification incorporating the SOW (app. br. at 4). Incircle argues the defect lies in the notice's statement that Incircle failed to comply with the purchase order's specifications, which had only just been added (*id.*). Incircle also argues the termination, which relies on the cure notice, is also defective (*id.* at 5).

This argument is flawed. As noted, the purchase order included the commercial item clause FAR 52.212-4, on which the termination is based. FAR 12.403, TERMINATION, addresses the government's requirements when terminating a commercial item contract for cause. Specifically, FAR 12.403(a) explains that the termination paragraphs in FAR 52.212-4 "contain concepts which differ from those contained in the termination clauses prescribed in part 49" and therefore "the requirements of part 49 do not apply when terminating" commercial item contracts; rather, contracting officers are to follow the procedures in FAR 12.403 but may use part 49 as guidance to the extent there is no conflict. FAR 12.403 does not require the contracting officer issue a cure notice before terminating the contract or purchase order for cause. *See* FAR 12.403(c); *United Healthcare Partners, Inc.*, 16-1 BCA ¶ 36,374 at 177,313 (cure notice not required in commercial item contract containing FAR 52.212-4). Accordingly, Incircle has failed to show that the default was excusable.

11

And regardless, here, we have found that the purchase order required Incircle provide cleaning services, which it failed to do in many instances, and Incircle understood the purchase order's requirement for cleaning was based on the SOW (prior to its inclusion) and failed to provide the required services. Therefore, the cure notice was not defective. Further, the termination was based on instances of deficient performance after the government modified the purchase order to include the SOW and therefore, as noted above, the termination was reasonable and supported by the record.

CONCLUSION

Based on the foregoing, the appeal is denied.

Dated: October 3, 2023

LAURA J. EYESTER
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62684, Appeal of Incircle Management, Inc., rendered in conformance with the Board's Charter.

Dated: October 3, 2023

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals